OLYMPIA CAPITAL ASSOCIATES,
L.P., Appellant

v.

Daniel L. JACKSON, in his Capacity as Receiver of Integral Arbitrage, L.P., Integral Hedging, L.P., Integral Equity, L.P., Integral Investment Management, L.P., and Integral Management, L.L.C., Appellee.

and

Daniel L. Jackson, in his Capacity as Receiver of Integral Arbitrage, L.P., Integral Hedging, L.P., Integral Equity, L.P., Integral Investment Management, L.P., and Integral Management, L.L.C., Appellant

v.

Olympia Capital International, Inc., Appellee.

No. 05–06–00479–CV.

Court of Appeals of Texas, Dallas.

March 3, 2008.

---

Jay J. Madrid, Craig Harris, Jaime Myers, Winstead Sechrest & Minick, P.C., Dallas, TX, for Appellant.

Karen Lynn Kellett, The Kellett Law Firm, Alexander N. Beard, Bishop & Hummert, P.C., Dallas, TX, for Appellee.

Before Justices WHITTINGTON, MOSELEY, and O'NEILL.

**OPINION**

Opinion by Justice MOSELEY.

Daniel L. Jackson, as receiver for Integral Arbitrage, L.P., Integral Hedging, L.P., Integral Equity, L.P., Integral Investment Management, L.P., and Integral Management, L.L.C., ("Receiver") filed suit against Olympia Capital Associates, L.P. ("Associates") and Olympia Capital International, Inc. ("International"). The trial court denied Associates's special appearance and granted International's. Associates and the Receiver appeal the respective orders. For the reasons that follow, we conclude that International's and Associates's contacts with Texas are insufficient to create either specific or general jurisdiction. Accordingly, we: (1) affirm the trial court's amended order sustaining International's special appearance and dismissing International; and (2) reverse the trial court's amended order overruling Associates's special appearance and enter judgment dismissing Associates for lack of jurisdiction.

## I. PERSONAL JURISDICTION

### A. Substantive Law

■ Texas courts may assert personal jurisdiction over a nonresident if it is authorized by the Texas long-arm statute and is consistent with federal and state constitutional due-process guarantees. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002). *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 17.041–.045 (Vernon 1997 & Supp.2007). The long-arm statute allows Texas courts to "reach as far as the federal constitutional requirements of due process will allow." *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex. 1991)). *See also* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (acts constituting "doing business" within state for purposes of long-arm statute). Thus, a Texas court may exercise personal jurisdiction over a nonresident if doing so complies with federal due-process requirements. *See Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575 (Tex.2007). Those requirements are satisfied if: (1) the nonresident defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

### 1. Nature of Contacts with Texas

■■ The contacts relevant to a jurisdictional analysis are those through which the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (citing *Int'l Shoe Co.,* 326 U.S. at 319, 66 S.Ct. 154). *See Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). Only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. *Michiana,* 168 S.W.3d at 785. Such contacts must be purposeful rather than random, fortuitous, or attenuated. *Id. See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n. 18, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Further, the "defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction." *Michiana,* 168 S.W.3d at 785. What is important is the quality and nature of the defendant's contacts with the forum state, rather than their number. *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806.

### 2. Extent of Contacts—Specific and General Jurisdiction

■■ A nonresident defendant's contacts with the forum state meet the federal due-process minimum contacts standard if the contacts establish either "specific jurisdiction" or "general jurisdiction." *See BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795–96 (Tex.2002).

#### a. Specific Jurisdiction

■■ Specific jurisdiction exists if the defendant's alleged liability arises out of or is related to the defendant's activities conducted within the forum. *See Helicopteros* *Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). *See also CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996). In other words, there must be "a substantial connection between [the nonresident's contacts with the forum] and the operative facts of the litigation." *Moki Mac,* 221 S.W.3d at 585. Specific jurisdiction is not established merely by allegations or evidence that a nonresident committed a tort in the forum state or "directed a tort" at the forum state. *Michiana,* 168 S.W.3d at 790–92.

#### b. General Jurisdiction

■■ General jurisdiction exists if the defendant's contacts with the forum are continuous and systematic, whether or not the defendant's alleged liability arises from those contacts. *BMC Software Belgium,* 83 S.W.3d at 796; *CSR Ltd.,* 925 S.W.2d at 595. General jurisdiction is "dispute-blind," as it permits the court to "exercise jurisdiction over the nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 168–69 (Tex.2007). Thus general jurisdiction involves a more demanding minimum-contacts analysis than that involved in specific jurisdiction, with a substantially higher threshold for subjecting the out-of-state defendant to personal jurisdiction. *Id* at 168. "Usually, 'the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.'" *Id.* (quoting 4 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1067.5 (2007))). The relevant time period for assessing

minimum contacts for general jurisdiction ends at the time suit is filed. *Id.* at 169.

### 3. Additional Due–Process Requirements

■ Federal due-process also requires the exercise of personal jurisdiction to comport with traditional notions of fair play and substantial justice. *BMC Software Belgium*, 83 S.W.3d at 795 (citing *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154). In making that determination we evaluate the defendant's contacts in light of the following factors: (1) the burden on the nonresident defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *See Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. 2174; *World–Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S.Ct. 559; *Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 231. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 231.

### B. Burden of Pleading/Proof

■ The plaintiff bears the initial burden of pleading sufficient allegations to invoke the provisions of the Texas long-arm statute. *Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807; *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985) (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex.1982)). Upon filing a special appearance, the nonresident defendant assumes the burden of negating all bases of personal jurisdiction alleged by the plaintiff.[1] *Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807; *Siskind*, 642 S.W.2d at 438 (citing E. Wayne Thode, *In Personam Jurisdiction; Article 2031b, The Texas "Long Arm" Jurisdiction Statute; And the Special Appearance to Challenge Jurisdiction in Texas and Elsewhere*, 42 Tex. L.Rev. 279, 322 (1964)). In other words, the defendant must disprove the existence of minimum contacts sufficient to establish personal jurisdiction over it—general, specific, or both—as alleged by the plaintiff. *See Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807; Thode, *supra* at 322. However, absent allegations of any specific, purposeful act through which the defendant can be said to have sought a benefit by "availing itself of the jurisdiction," *Michiana*, 168 S.W.3d at 785, evidence that a defendant is a nonresident is sufficient to meets its burden. *See Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 633 (Tex.App.-Dallas 1993, writ denied) (citing *Siskind*, 642 S.W.2d at 438).

### C. Standard of Review

■ Whether personal jurisdiction exists is a question of law, and we review the trial court's ruling on a special appearance de novo. *BMC Software Belgium*, 83 S.W.3d at 794. However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *Id.* If the trial court does not issue findings of fact, we imply all such findings necessary to support the judgment that are supported by the evidence. *See id.* at 795. However, when a reporter's record is included in the appellate record, the trial court's findings of fact—express or im-

---

1. The plaintiff would retain the burden of proof as to any alter-ego theory alleged in support of personal jurisdiction. *See PHC–Minden, L.P.*, 235 S.W.3d at 173.

plied—are not conclusive, and are subject to challenge on evidentiary sufficiency grounds. *See id.* A legal sufficiency challenge to a finding of fact fails if there is more than a scintilla of evidence to support the finding. *See id.* In conducting a factual sufficiency review, we may set aside the trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Hoffmann v. Dandurand,* 180 S.W.3d 340, 345 (Tex.App.-Dallas 2005, no pet.).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellee International is a corporation organized and registered in the British Virgin Islands; its managing office is located in Bermuda. International is an administrator of investment funds that are primarily organized under laws outside the United States. Appellant Associates is a Delaware limited partnership with its principal place of business in New York. Associates administers investment funds that are primarily organized under the laws of the United States. It is owned by Brooke Security Holdings, Inc. ("BSHI"), which is not a party to this appeal. International and BSHI entered into an "Amended and Restated Administrative Assistance Agreement," pursuant to which BSHI sometimes directed Associates to provide services to International's clients or potential clients.

Integral Hedging, L.P., Integral Arbitrage, L.P., and Integral Equity, L.P.(collectively, "the Funds") are Texas limited partnerships. The Funds' general partner was Integral Investment Management, L.P., which was controlled by its general partner, Integral Management, L.L.C. The Funds were founded and controlled by Conrad Seghers, who was the sole member of Integral Management, L.L.C.

In 1998, Seghers began marketing the Funds and securing investors. In 2000, he decided to retain an administrator to handle all asset valuations for the Funds and their investors, as well as the Funds' marketing, investor contacts, and other investor correspondence. As a result, the Funds entered into negotiations with International, which was assisted by Associates pursuant to the International/BSHI agreement.

As a result of these negotiations, in August 2000, International and the Funds entered into an "Agency and Administration Agreement." [2] Under the agreement, International agreed that it and "its Affiliates" would "perform or supervise the performance of" certain services pertaining to the Funds, subject to the "general and ultimate supervision" of general partner of the Funds.[3] The agreement states that: (1)

**2.** In the Agency and Administration Agreement, the phrase "the Funds" is defined to include Genesis Market Neutral Index Fund, L.P., and Sum–It Investments, L.P. According to Associates's brief, these entities are now known as Integral Equity, L.P. and Integral Arbitrage, L.P., respectively, which is how the Receiver refers to them in his brief. Accordingly, our references to "the Funds" are to the entities as they are now known.

In addition to the Funds, three other entities entered into the Agency and Administration Agreement. Two are Texas entities (Exponential Returns, L.P. and Pinnacle Option Fund, L.P.); the third entity, Integral Hedg-

ing Offshore, Ltd., is an offshore entity with Texas connections.

**3.** These services, as quoted below, include:

establishing and maintaining such bank, brokerage, custodian and other accounts as may be necessary or advisable;
processing of the acceptance of capital contributions and collecting payments for interests in the respective [Funds]; disbursing payments in connection with the withdrawal by limited partners of interests in the [Funds];

International "shall for all purposes herein be deemed to be an independent contractor"; (2) International "is not in a position, and shall not in any event be required, to engage in any activity or provide any services within the United States"; and (3) the provisions of the agreement "shall be construed and interpreted in accordance with the laws of the British Virgin Islands as from time to time in effect."

Many of International's contract obligations under Agency and Administration Agreement were performed by Associates pursuant to the International/BSHI agreement. These duties included calculating the net asset values of each Fund and its investors' accounts monthly and annually

and sending monthly account statements to each Fund and its investors. According to Seghers, during the time International and Associates acted as the Funds' administrator, the Funds' investors included at least nine Texas residents.

According to Seghers, International and Associates breached the Agency and Administration Agreement by, among other things, failing to calculate the values of the Funds and failing to communicate with the Funds' investors. According to Seghers, on September 28, 2001, without the Funds' authorization, International and Associates mailed investors, including those in Texas, a letter notifying them that International

distribution of annual, monthly, and other periodic reports to the investors in the respective entities;

preparing and maintaining such financial and accounting books and records as are necessary to support an annual independent audit of the financial condition of the Funds in order to comply with applicable law, and cooperation in such audit;

preparing or supervising the preparation and filing of all returns, reports and registrations required by the laws of any applicable jurisdiction;

responding to and communicating with investors and prospective investors, and members of the general public (including publishing or furnishing the offering and redemption and withdrawal prices of the Funds' securities) and distributing the respective Funds' Memoranda and marketing materials;

preparing and maintaining such other books and records as may be necessary for the orderly operation of the business of the Funds and which are not otherwise required to be maintained by the custodian and/or Broker or other agents;

calculating the net asset value of each Fund in accordance with its then-current Memorandum ...

calculating investment advisory fees payable to the investment advisor of each Fund ...

reviewing such statements provided by the Funds' investment advisors with respect to payments due or withdrawals by such investment advisor, and confirmation to such

investment advisor and/or custodian(s) of the respective Fund's assets that such payments or withdrawals are in conformity with applicable Documents.

The agreement further provides for the following obligations quoted below:

[International] on behalf of the Funds shall pay directly or cause to be paid all of the following expenses incurred in the conduct of the Fund[s'] business affairs, including but not limited to the following: investment advisory fees, administration fees and expenses, dividends, taxes, interest, ... fees and costs of all agents retained on the Fund[s]' behalf, ... and any and all other expenses not specifically designated herein as payable by [International] for its own account.

[International] shall provide to the brokers and the investment advisors of the Funds such information maintained by [International] pursuant to this Agreement as may be required for such parties to perform their contractual obligations to the respective Funds.

[International] shall cooperate with the investment advisors in the performance of their duties with respect to the Funds.

[International] shall render to the ... General Partner, as applicable, such periodic and other reports as they may reasonably request with respect to matter relating to the duties of [International] as set forth herein.

and Associates had suspended calculation of the Funds' net asset values. As a result, many investors made redemption requests to the Funds.

Then, according to Seghers, International resigned as agent and administrator for the Funds on October 4, 2001, effective January 4, 2002. Even though the Agency and Administration Agreement required the calculation and distribution of investment valuations and investor statements, none were sent for November or December 2001.

On November 29, 2001, International and Associates sent a statement containing, over Seghers's objection, a footnote regarding the valuation of an entity in which the Funds had invested, Galileo Fund, L.P. ("Galileo"). The footnote stated International had received information from representatives of Galileo's general partner that the net asset value of certain of Galileo's investments would be down by over ninety percent if calculated on the basis of "mark-to-market liquidation valuation." [4] Subsequently, according to Seghers, International and Associates ignored his inquiries, and investors lost confidence and made redemption requests. As a result, according to Seghers, International

and Associates "destroyed the viability of the Funds."

Ultimately, the Funds lost value and were sued by an investor. Daniel L. Jackson was appointed as receiver for the Funds. [5] The Receiver sued Seghers and other individuals and entities for breach of fiduciary duty, fraud, theft, and conspiracy. [6] The Receiver also filed this suit against International and Associates for breach of the Agency and Administration Agreement; breach of fiduciary duty; violation of the Texas Deceptive Trade Practices–Consumer Protection Act; fraud; and negligent administration. The Receiver alleged that International and Associates operated as a "single business enterprise." [7]

Both International and Associates filed special appearances, supported by affidavits, contending they had no presence in Texas and the trial court could not exercise personal jurisdiction over them. The Receiver filed one response to both special appearances, also supported by evidence. At the special appearance hearing, the trial court sustained some of International's and Associates's objections to the Receiver's evidence, and the Receiver indicated

---

**4.** As provided by the Agency and Administration Agreement, the Galileo Fund, L.P.'s general partner provided valuations to International for the Funds' assets invested in the Galileo Fund, L.P., and International "shall be entitled to rely on such valuation information with no obligation to independently verify or investigate such."

**5.** As noted above, Jackson was also appointed receiver of Integral Investment Management, L.P. and Integral Management, L.L.C.

**6.** The Receiver alleged that Seghers engaged in self-dealing, and that he and other officers of the Funds altered the investment plans for the Funds and invested in "portfolios of bad debt and other speculative ventures" causing injury to the Funds.

**7.** According to the Receiver, "[t]he same individuals essentially control International and Associates"; they used similar business names; they commonly referred to their enterprise as Olympia Capital; and employees of Associates rendered services on behalf of International. Specifically as related to this litigation, the Receiver alleged International and Associates marketed themselves to the Funds as a single entity for the purposes of performing the duties as administrator under the Agency and Administration Agreement; employees of both International and Associates negotiated the Agency and Administration Agreement; and employees of Associates performed the duties required of International under the Agency and Administration Agreement.

he did not rely on certain other evidence. The trial court denied Associates's special appearance and granted International's. The Receiver filed a motion for reconsideration of the trial court's ruling as to International, which International opposed in a response. In amended orders, the trial court did not change its original rulings. The trial court filed no findings of fact. These appeals followed and have been consolidated.

## III. OBJECTIONS TO EVIDENCE

Associates supported its special appearance with the affidavit of its senior vice-president, Laurence Platoni. International supported its special appearance with the affidavit of senior vice-president and general counsel, Priscilla Murray–Brown. The Receiver filed a written objection to these affidavits. However, at the hearing on the special appearances, counsel for the Receiver stated he had no objection to either affidavit, and they were admitted.

The Receiver supported his response to the special appearances with Seghers's affidavit and attached exhibits. At the special appearance hearing, counsel for International and Associates objected to parts of Seghers's affidavit. The trial court sustained many of these objections, which the Receiver does not challenge on appeal. Accordingly, in our analysis we do not consider those parts of Seghers's affidavit that the record shows the trial court struck.

The Receiver also supported his response with the affidavit of Craig Harris and attached exhibits. Harris identified Exhibit 2, consisting of 163 pages, as "documents produced by the Olympia defendants in response to the Receiver's requests for production seeking written or electronic communications between the Olympia defendants and Texas entities other than [the Funds]." Counsel for International and Associates objected to the documents in Exhibit 2 that had dates after the date of the Receiver's third-party suit (April 9, 2003), arguing that, for general jurisdiction, only the contacts established up to the date of the lawsuit were relevant. Counsel for the Receiver conceded this point, stating: "Only the matters that are prior to the filing of an action against Olympia are the ones that we relied on." He stated, "We'll back date it to April, 2003." Accordingly, the record shows the Receiver effectively withdrew those documents dated after April 2003, despite the Receiver's statement in his brief that none of the exhibits were withdrawn or struck due to objection. We do not consider those documents in our analysis.

## IV. JURISDICTION

Associates argues the trial court erred in overruling its special appearance. The Receiver argues the trial court erred in granting International's special appearance and dismissing the Receiver's claim against International.

### A. Imputing or Attributing Contacts between Defendants

On appeal, the Receiver argues two theories under which the trial court should have imputed or attributed the forum contacts of one entity to the other: the existence of a "single business enterprise" between International and Associates, and the existence of an agency relationship between Associates as agent and International as principal. We consider each of these theories.

#### 1. Single Business Enterprise

■ In his third amended petition, the Receiver alleged that International and Associates operated as a single business enterprise, "carrying out a common

business objective," and were jointly and severally liable for the wrongful conduct and the Funds' damages. "The 'single business enterprise' theory of liability is described as analogous to partnership principles: that when corporations are not operated as separate entities, but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for the debts incurred by the other component entities in pursuit of that business purpose." *Aluminum Chems. (Bol.), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 68 (Tex. App.-Texarkana 2000, no pet.) (citing *Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex. App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.)).

By granting International's special appearance and denying Associates's, the trial court impliedly found against the Receiver on his single business enterprise theory as a basis for imputing the jurisdictional contacts of one entity to another. In his brief as appellee, the Receiver argues the evidence in the record makes clear that International and Associates are a single business enterprise, thus challenging the legal and factual sufficiency of the evidence supporting the trial court's implied finding that no single business enterprise exists for jurisdictional veil-piercing.

However, the Texas Supreme Court has not endorsed "single business enterprise" as a theory under which an entity may be held responsible for the debts of another, and it clearly has not endorsed "single business enterprise" as a basis for imputing the jurisdictional contacts of one entity to another. *See PHC–Minden, L.P.*, 235 S.W.3d at 173. Further, it specifically stated that some of the factors that might be relevant to any "single business enterprise" joint-liability theory are irrelevant to a constitutional due-process analysis of jurisdictional contacts. *See id.* at 175. *See also BMC Software Belgium*, 83 S.W.3d at 799.

In light of *PHC–Minden, L.P.* and *BMC Software Belgium*, we decline to hold that a single business enterprise theory can be a basis for piercing the corporate veil for jurisdictional purposes. Accordingly, we reject the Receiver's arguments that single business enterprise affords a basis for imputing the jurisdictional contacts of either International or Associates to the other.

## 2. Agency

▮ In addition to stand alone grounds based on each entity's contacts, the Receiver argues that a principal/agent relationship supports personal jurisdiction. Although the Receiver did not plead an agency theory, he argued in his motion for reconsideration that Associates was International's agent. In its response, International argued that the Receiver failed to prove his agency theory.

We conclude the agency theory as a basis for attributing the jurisdictional contacts of Associates to International was tried by consent. *See* Tex.R. Civ. P. 67. ("[W]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 771 (Tex.App.-Dallas 2005, pet. denied) (stating party's unpleaded issue may be deemed tried by consent when evidence on issue is developed under circumstances indicating both parties understood issue was in case, and other party failed to make appropriate complaint).

▮ Contacts of an agent may be sufficient to confer jurisdiction upon the principal. *Novamerican Steel, Inc. v. Delta Brands, Inc.*, 231 S.W.3d 499, 511 (Tex. App.-Dallas 2007, no pet.). *See Davis v.*

*Asano Bussan Co.*, 212 F.2d 558, 563–64 (5th Cir.1954) (agent's actions in Texas subjected principal to jurisdiction in state court). An agent is one who consents to the control of another to conduct business or manage some affair for the other, who is the principal. *Schott Glas v. Adame*, 178 S.W.3d 307, 315 (Tex.App.-Houston [14th Dist.] 2005, pet. denied), *disapproved of on other grounds by PHC–Minden, L.P.*, 235 S.W.3d at 169; *Walker Ins. Servs. v. Bottle Rock Power Co.*, 108 S.W.3d 538, 549 (Tex.App.-Houston [14th Dist.] 2003, no pet.). We do not presume an agency relationship exists, and the burden of proof is on the party asserting the existence of the relationship. *Schott Glas*, 178 S.W.3d at 315; *Bottle Rock*, 108 S.W.3d at 549.

▆▆▆▆ An essential element of the principal-agent relationship is the alleged principal's right to control the actions of the alleged agent. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993). This right includes not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task. *Ross v. Tex. One P'ship*, 796 S.W.2d 206, 210 (Tex. App.-Dallas 1990), *writ denied*, 806 S.W.2d 222 (Tex.1991) (per curiam). In contrast, when one has the right to control the end sought to be accomplished, but not the means and details of how it should be accomplished, the person employed acts as an independent contractor and not as an agent. *Schott Glas*, 178 S.W.3d at 315; *First Nat'l Bank v. Bullock*, 584 S.W.2d 548, 551–52 (Tex.Civ.App.-Austin 1979, writ ref'd n.r.e.). This distinction is critical here because an agent's contacts with the forum are attributable to the principal, but the contacts of an independent contractor are not. *Schott Glas*, 178 S.W.3d at 315; *Bottle Rock*, 108 S.W.3d at 549 n. 4 (citing *Daynard v. Ness, Motley, Loadholt,*

*Richardson & Poole, P.A.*, 290 F.3d 42, 55 (1st Cir.2002)).

By granting International's special appearance and denying Associates's, the trial court impliedly refused to find facts in support of the Receiver's agency theory as a basis for attributing Associates's jurisdictional contacts to International. In his brief as appellee, the Receiver argues the evidence in the record makes clear that Associates acted as International's agent, thus challenging the legal and factual sufficiency of the evidence supporting the trial court's implied finding that no agency relationship exists. As the Receiver had the burden of proof as to whether an agency relationship existed, *Schott Glas*, 178 S.W.3d at 315, he must show that he proved as a matter of law that Associates was International's agent, or that the trial court's implied adverse finding to the contrary was against the great weight and preponderance of the evidence. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241–42 (Tex.2001).

There is substantial evidence that International did not have control over the means and details of Associates's work. *See Exxon Corp.*, 867 S.W.2d at 21; *Ross*, 796 S.W.2d at 210. It is undisputed that all International's work for the Funds was the responsibility of BSHI pursuant to the International/BSHI agreement. That agreement was attached to Murray–Brown's affidavit in support of International's special appearance. According to that agreement, International "appointed" BSHI to assist it in providing administrative services to funds for which International had agreed to provide administrative services. The International/BSHI agreement states that BSHI is an independent contractor, and acknowledges that BSHI's "agents" may be involved in performing its duties. It is undisputed that one of those agents was Associates. Therefore, BSHI's

status as an independent contractor—not an agent—of International under the International/BSHI agreement also establishes Associates's status an independent contractor in performing duties on BSHI's behalf.

Further, Murray–Brown stated in her affidavit that, pursuant to the International/BSHI agreement, BSHI acted as an independent contractor, and, as a result, International did not have the right to and did not control the actions of BSHI or Associates. Murray–Brown also stated that International paid BSHI for Associates's services provided pursuant to the International/BSHI agreement. Platoni also stated in his affidavit that International did not have the right to control BSHI's or Associates's actions. *See Novamerican Steel, Inc.*, 231 S.W.3d at 512 (considering "right of control standard," alleged employee/agent's testimony that he was "not an employee, but a contract laborer" insufficient to attribute contacts to alleged principal for general jurisdiction).

Nevertheless, the Receiver relies on evidence that Associates performed International's duties and obligations under the Agency and Administration Agreement. First, the Receiver points to evidence that Associates was an "affiliate," "associate," or "liaison" of International. The Receiver points to a March 22, 2000 letter from International to Seghers listing Associates as an affiliate. That letter states that "high quality offshore administrative services [are] centered on our Bermuda operations [i.e., International], *working in coordination with* our office in New York [i.e., Associates]...." (Emphasis added.) The Receiver also relies on an Associates's "Response to Client Questionnaire" in which are described the organization of "Olympia." This document names the personnel of both International (Oskar Lewnowski and Murray–Brown) and Associates (Barbara Lewnowski and Platoni) as "key principals in the organization"; describes the activities of "Olympia's" offices in Bermuda, New York, and elsewhere; states that administration and accounting work for stand-alone United States limited partnerships is performed out of New York (i.e., by Associates); describes "coordination" by various personnel of the "initial contact" and review of "fund offering documents" by several internal parties, including International personnel.

 However, the mere existence of a corporate relationship between International and Associates is insufficient to disregard their separate identities to attribute jurisdictional contacts. *See Burger King Corp.*, 471 U.S. at 480 n. 22, 105 S.Ct. 2174 (stating that commercial activities "carried on in behalf of" a party "may sometimes be ascribed to the party" but declining to "resolve the permissible bounds of such attribution"). *See also Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004) ("As a general rule, however, the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated."). Further, nowhere in the documents cited by the Receiver is a statement that International controls the means and details of Associates's work.

Second, the Receiver points to evidence that Seghers negotiated the Agency and Administration Agreement with Barbara Lewnowski and Platoni, both officers of Associates, but that all major points had to be approved by International's chairman, Oskar Lewnowski (Barbara's father). However, this evidence shows Associates's right to control the progress of the negotiations except as to final results, which is evidence of an independent contractor, not

an agent. *See Pitchfork Land & Cattle Co. v. King,* 162 Tex. 331, 346 S.W.2d 598, 602–03 (1961). *See also Schott Glas,* 178 S.W.3d at 315; *First Nat'l Bank,* 584 S.W.2d at 551–52.

Third, the Receiver relies on evidence that an Associates's analyst sent documents marketing the Funds to potential investors in Texas and to Seghers and that Associates sent financial statements, shareholder summaries, and other information about the Funds' accounts to Seghers and the Funds. These items show preparation by Associates's personnel, but not any involvement by International in the content of the documents, much less the right to control the means and details of Associates's work in producing them. *See Exxon Corp.,* 867 S.W.2d at 21; *Ross,* 796 S.W.2d at 210.

The Receiver asserts Associates is International's agent under both an actual and an apparent authority. However, what is at issue here is the extent of International's control over the means and details of Associates's work, not the authority under which Associates acted. *See Bottle Rock,* 108 S.W.3d at 550 ("While actual authority is created by written or spoken words or conduct by the principal to the agent, apparent authority is created by written or spoken words or conduct by the principal to a third party."). The Receiver also argues International ratified Associates's actions, accepting them as International's own. But ratification has no application here, as it is undisputed that Associates's actions were authorized by International. *See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex.1980) ("Ratification may occur when a principal, though he had no knowledge originally of the unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge.").

Having reviewed the evidence, we conclude the Receiver did not conclusively prove that Associates was International's agent, and that the trial court's implied finding to the contrary was not against the great weight and preponderance of the evidence. *See Dow Chem. Co.,* 46 S.W.3d at 241–42. Thus, we reject the Receiver's sufficiency challenge to the trial court's implied finding that no agency relationship existed between Associates and International such that Associates's jurisdictional contacts could be attributed to International.

### 3. Alter-ego

■ In his response to their special appearances, the Receiver referred to Associates as International's "agent and alter ego" and also referred to them collectively as "Olympia." In his briefs on appeal, the Receiver also refers to Associates as International's "agent and alter ego." However, the Receiver did not plead alter-ego as a basis on which to impute Associates's contacts with Texas to International. He did not offer any evidence in support of an alter-ego theory, on which he had the burden of proof. *See PHC–Minden, L.P.,* 235 S.W.3d at 173. And he advances no argument in his briefs on appeal as to an alter-ego theory beyond the phrase "agent and alter ego." Thus the Receiver has failed to preserve any issue on appeal as to an alter-ego theory for jurisdictional veil-piercing, and we need not address it further. *See* Tex.R.App. P. 38.1(h).

### 4. Conclusion as to Bases for Imputing or Attributing Jurisdictional Contacts

We reject the Receiver's arguments that the contacts of either Associates or International with Texas must be imputed or attributed to the other for jurisdictional purposes.

## B. Jurisdictional Minimum Contacts Analysis

We now turn to the evidence of Associates's and International's respective, individual, contacts with Texas. The trial court found that International's contacts were not sufficient to support personal jurisdiction, but that Associates's contacts were sufficient to support personal jurisdiction over it. We will review any evidentiary disputes as to either entity's contacts and determine whether the evidence supports an implied finding for or against the existence of a particular jurisdictional fact as to that entity. *See BMC Software Belgium*, 83 S.W.3d at 794. We then review de novo the trial court's decision that the exercise of personal jurisdiction over that entity does or does not comply with federal due-process requirements. *See Moki Mac*, 221 S.W.3d at 575; *BMC Software Belgium*, 83 S.W.3d at 794. We note that the Receiver relies on the same evidence of contacts, attached as exhibits to Seghers's and Harris's affidavits, to argue jurisdiction exists over both Associates and International. Accordingly, we consider this evidence as it relates to each entity.

### 1. Specific Jurisdiction

The Receiver argues that both International and Associates purposefully established sufficient minimum contacts substantially related to the claims against them such that the trial court had specific jurisdiction over them. International and Associates disagree, arguing neither entity had sufficient minimum contacts to support specific jurisdiction in Texas. We consider these contacts in a generally chronological sequence.

#### a. Marketing to the Funds and Contract Negotiations

■ The Receiver argues the defendants marketed themselves to Seghers. The Receiver relies on International's March 22, 2000 letter from Oskar Lewnowski (International's chairman) to Seghers at the Funds' then-office address in Dallas. The letter states it was sent pursuant to Seghers's conversation with Tom Prunty, an Associates employee, and as requested by Seghers, describes International's fund administration services. Seghers stated in his affidavit: "An investor as well as an attorney at [a law firm] placed the Funds in contact with [International] and [Associates]...." Another document titled "[Associates] Response to Client Questionnaire" describes Associates's organization.

Both Murray–Brown and Platoni stated that Seghers contacted Prunty and that Seghers had been referred to Prunty by the manager of an offshore hedge fund. Platoni stated that Associates had never sent unsolicited material or unsolicited information into Texas and had never advertised in any Texas publication. Platoni said that no Associates employee ever visited Texas in connection with the negotiations of the Agency and Administration Agreement. Murray–Brown made the same statement regarding International, stating specifically that International provided a bid to Seghers at his request outlining International's services and International's representative signed the Agency and Administration Agreement in Bermuda. These statements are not contested.

We conclude the undisputed evidence shows that any marketing documents, including the March 22, 2000 letter, sent to Seghers were not part of a purposeful effort by International or Associates to avail themselves of the benefits of conducting activities in Texas; rather, they constitute random, fortuitous, or attenuated contacts with the forum. *See 3–D Elec. Co. v. Barnett Constr. Co.*, 706 S.W.2d 135, 142 (Tex.App.-Dallas 1986, writ ref'd n.r.e.) (weighing fact that third party initiated contact with nonresident defendant for

purposes of negotiating contract with Texas resident in favor of finding against purposeful availment). *See also Burger King Corp.*, 471 U.S. at 475 n. 18, 105 S.Ct. 2174; *World–Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. 559; *Michiana*, 168 S.W.3d at 785.

Seghers also stated that he negotiated the terms of the proposed Agency and Administration Agreement with Associates's Barbara Lewnowski and Platoni, but that International's Oskar Lewnowski had to approve all major points. According to Seghers, negotiations were conducted via e-mail and telephone between himself in Dallas and the "Olympia" representatives. However, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. *See Michiana*, 168 S.W.3d at 785.

After reviewing the evidence relied on by the Receiver, International, and Associates as to marketing and contract negotiations, we conclude the evidence does not show that International or Associates purposefully availed themselves of the benefits and protections of Texas law.

**b. The Agency and Administration Agreement**

The Receiver argues International and Associates purposefully established sufficient minimum contacts with Texas by entering into the Agency and Administration Agreement with the Funds. However, it is undisputed that Associates was not a party to this agreement. Regarding International, merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction. *See Burger King Corp.*, 471 U.S. at 478–79, 105 S.Ct. 2174; *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir.1986). Moreover, the Agency and Administration Agreement provides that its provisions "shall be construed and interpreted in accordance with the laws of the British Virgin Islands as from time to time in effect." Such a provision does not support an inference of purposeful availment. *See Burger King*, 471 U.S. at 481–82, 105 S.Ct. 2174; *Holt Oil & Gas Corp.*, 801 F.2d at 778; *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029–30 (5th Cir.1983).

The Receiver also argues International and Associates purposefully established sufficient minimum contacts with Texas by performing services under the Agency and Administration Agreement. This performance includes, according to Seghers's affidavit: International's transmission of Associates-generated investor statements, including the November 20, 2001 statement with the Galileo Fund, L.P. footnote, to the Funds' investors, some of whom lived in Texas; payment by Texas investors in the Funds of a part of International's fees because those fees were based on the monthly aggregate net asset value of the Funds; communications by telephone and e-mail between Seghers and International and Associates's representatives regarding the Funds' business; and provision by Murray–Brown of legal advice to the Funds and their principals under the Agency and Administration Agreement. Regarding communications between International and the Funds, Seghers acknowledged in his affidavit that International communicated with him and with the Funds in Texas "while fulfilling [its] role as the Funds' administrator," that is, pursuant to the Agency and Administration Agreement.

In his affidavit, Platoni stated Associates, at BSHI's direction, performed many of International's obligations under the Agency and Administration Agreement and that any activities conducted by Associates under the International/BSHI agreement "occurred entirely in New

York." Specifically regarding the Galileo Funds, L.P. issue, Platoni stated that, in monthly e-mails, Seghers provided the value of the Funds' investments in the Galileo funds.

In her affidavit, Murray–Brown stated that no officer, director, or employee of International visited Texas pursuant to the Agency and Administration Agreement; any activities International performed under that agreement occurred in Bermuda; and all communications with Seghers were through telephone, e-mail, fax, and mail, and almost all were in response to communications initiated by Seghers. In addition, the Agency and Administration Agreement states specifically that "the Funds understand and accept that [International] is not in a position, and shall not in any event be required, to engage in any activity or provide any services within the United States."

■■■ Thus, the record shows that all of the communications among Seghers, the Funds' investors, International, and Associates were made pursuant to the Agency and Administration Agreement. The existence of a contract between the nonresident defendant and a resident of the forum and engaging in communications related to the execution and performance of that contract are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant. *Freudensprung*, 379 F.3d at 344. *See Credit Commercial de France, S.A. v. Morales*, 195 S.W.3d 209, 222–23 (Tex.App.-San Antonio 2006, pet. denied) (concluding "remote communications" of Bahamian bank to Texas investor showed banking business and appraisal of Texas investor of business activities in the Bahamas). *See also Burger King Corp.*, 471 U.S. at 478–79, 105 S.Ct. 2174 (merely contracting with resident of forum state is insufficient to sub-

ject nonresident to the forum's jurisdiction). Also, the parties structured their business arrangements to avoid doing business in Texas by providing that performance would occur in New York or Bermuda, not in Texas. *See Holt Oil & Gas Corp.*, 801 F.2d at 778.

Nevertheless, the Receiver relies on *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), to argue that the effects of International's and Associates's intentional conduct were felt in Texas. Specifically, the Receiver argues International and Associates sent erroneous financial statements and monthly fund asset valuations to the Funds and their Texas investors knowing they would rely on such information. However, the Texas Supreme Court has "expressly rejected jurisdiction 'based solely upon the effects or consequences of an alleged conspiracy' in the forum state." *Michiana*, 168 S.W.3d at 789 (quoting *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex.1995)). The supreme court stated, "Instead, it is 'the defendant's conduct and connection with the forum' that are critical." *Id.* (quoting *Burger King Corp.*, 471 U.S. at 474, 105 S.Ct. 2174).

In discussing *Calder*, the supreme court in *Michiana* noted the "substantial presence" of an (allegedly defamatory) article in the *National Enquirer*, 600,000 copies of which were sold weekly in the forum. *Id.* (citing *Calder*, 465 U.S. at 785 n. 2, 104 S.Ct. 1482). The court also cited as an example of "the extent of the defendant's activities" in the forum state a lawsuit involving an allegedly defamatory article in a magazine, 10,000 copies of which were sold monthly in the forum state. *Id.* at 789–90 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).

Here the record shows that, between approximately June 2000 and September

2001, Associates sent financial statements and monthly fund asset valuations to the six Funds that were parties to the Agency and Administration Agreement and nine Texas investors in the three Funds at issue here, all sent pursuant to the agreement. We cannot conclude that this activity constitutes a "substantial presence" pursuant to *Calder. See id.*

In his affidavit, Seghers stated that International and Associates misappropriated $100,000 of the Funds' assets. However, there is no evidence that any financial transaction between the Funds and International and Associates occurred in Texas. Murray–Brown's affidavit stated that payment of fees to International under the Agency and Administration Agreement was not sent from Texas and was received by International outside of Texas. Platoni's affidavit stated that any activities it conducted under the International/BSHI agreement on behalf of International pursuant to the Agency and Administrative "occurred entirely in New York."

### c. Documents Marketing the Funds to Potential Investors

The Receiver also argues that International and Associates established sufficient minimum contacts with Texas by sending documents marketing the Funds to potential investors in Texas and to Seghers. As evidence, the Receiver relies on the marketing documents attached as exhibits to Seghers's affidavit, including: (1) examples of documents provided to Seghers illustrating the kind of marketing International could provide to potential investors on behalf of the Funds; and (2) a memorandum of market support services Associates could provide. These documents are dated after the Agency and Administration Agreement was entered into, which provided that International or its "affiliates" would distribute the Funds' marketing materials. We have noted above that communications related to the execution and performance of the contract are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant. *See Freudensprung.* 379 F.3d at 344; *Credit Commercial de France, S.A.,* 195 S.W.3d at 222–23. Therefore, this evidence does not present the type of contact that shows either International or Associates purposefully availed themselves of the benefits and protections of Texas law.

### d. Conclusions as to Specific Jurisdiction

We have reviewed the evidence in the record with respect to whether International or Associates purposefully established sufficient minimum contacts with Texas such that the trial court could exercise specific jurisdiction over them. We conclude the evidence does not show that International or Associates purposefully availed themselves of the benefits and protections of Texas law. *See PHC–Minden, L.P.,* 235 S.W.3d at 168; *BMC Software Belgium,* 83 S.W.3d at 795–96. Accordingly, we conclude the trial court did not err in granting International's special appearance on grounds it lacked specific jurisdiction over International, and we resolve the Receiver's issue and arguments as to specific jurisdiction over International against the Receiver. We further conclude the trial court erred in denying Associates's special appearance on grounds it could exercise specific jurisdiction over Associates, and we resolve Associates's issue and arguments as to specific jurisdiction in its favor.

### 2. General Jurisdiction

The Receiver argues the trial court could exercise general jurisdiction over International and Associates because of their continuous and systematic contacts with

Texas. International and Associates disagree, arguing neither entity had sufficient minimum contacts to support general jurisdiction in Texas.

### a. International's and Associates's Evidence

The evidence established that International was organized and registered in the British Virgin Islands, with its managing office in Bermuda; it never had an office anywhere else; it had never been a resident or citizen of Texas; it never had an office or place of business in Texas; it had never been to Texas; had never been licensed to do business in Texas; it had no property or assets in Texas; it had no officer, director, agent, or representative in Texas, not had it ever maintained a registered agent for service of process in Texas; it had never filed suit in Texas, or entered into a contract for purchasing or supplying goods or services in Texas, and had never been required to pay sales, property, or any other taxes in Texas or to Texas governmental agencies.

The evidence also established that Associates was a Delaware limited partnership with its principal place of business in New York; it did not have an office or place of business in Texas; it was not licensed to do business in Texas and did not have any officers, agents, representatives, property, or other assets in Texas; it had never been to Texas in connection with any of the allegations in the suit.

### b. The Receiver's Evidence of Continuous and Systematic Contacts

The Receiver relies on ten pages of telephone invoices "as examples of the hundreds of pages of telephone records" showing International's and Associates's calls made to Texas. Five of the pages show twenty-eight calls made by Associates in June 2002 and two calls in July 2002 made to various numbers in Texas and their duration. The other five pages show six calls made by International to various numbers in Texas and their duration. Nothing in the record identifies the party called or the reason for the call. However, the Receiver argues these telephone calls "were obviously related to [their] business activities in Texas."

The Receiver also relies on documents produced in response to requests seeking written or electronic communications between "the Olympia defendants" and Texas entities other than the Funds. These documents consist of: (1) e-mails between Associates and "Inwood Capital"; (2) account statements from Associates to individuals regarding Texas entities other than the Funds; and (3) "notes/history" of Associates's contacts with individuals and entities. Many of the e-mails and all of the account statements are irrelevant to the jurisdictional inquiry because they are dated after April 2003, when this suit was filed, and were effectively withdrawn by the Receiver, as noted above. *See PHC–Minden, L.P.*, 235 S.W.3d at 169. The remaining e-mails are dated 2001 and 2002 and relate to an offshore fund and a domestic fund. They relate to client services by Associates such as marketing and investor communications. The "notes/history" show letters, e-mails, and telephone calls from Barbara Lewnowski of Associates to one individual and twenty-one entities. They are dated beginning in 1995. They show contacts regarding Associates's services, announcements of Associates business events, notes regarding potential clients, communications from clients, and reports sent. The Receiver provides no argument how these communications differ from those provided to the Funds under the Agency and Administration Agreement. These documents, with very few exceptions, relate to Associates; the Receiver does not explain how they show

continuous and systematic contacts by International.

### c. Analysis

■ Our inquiry is whether this evidence shows a "fairly substantial" level of continuous and systematic contacts for general jurisdiction. *See id.* at 167, 169. In connection with our inquiry, we consider the Supreme Court's analysis in two personal jurisdiction cases.

In *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). There, the president of a Philippine mining corporation maintained an office in Ohio during World War II, where he conducted personal and corporate affairs, kept office files, carried on business correspondence, distributed salary checks, maintained bank accounts for company funds, held several directors' meetings, and "supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines." *Id.* at 447–48, 72 S.Ct. 413. According to the Supreme Court, the president "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." *Id.* at 448, 72 S.Ct. 413.

Next, in *Helicopteros Nacionales de Colombia, S.A.,* 466 U.S. at 416, 104 S.Ct. 1868, the Supreme Court considered the contacts with the forum state of a Colombian corporation that was in the business of supplying helicopters for oil and construction companies in South America. Helicol sent its chief executive officer to Houston for a contract negotiation session; accepted into its New York bank account checks drawn on a Houston bank; bought helicopters, equipment, and training services from Bell Helicopter in Texas for "substantial sums"; and sent personnel to Bell's facilities in Texas for training. *Id.* The Supreme Court analyzed these contacts "to determine whether they consti-

tute the kind of continuous and systematic general business contacts the Court found to exist in *Perkins.*" *Id.* The Court concluded that they were insufficient for general jurisdiction. *Id.* at 416–19, 104 S.Ct. 1868. The Court stated that beyond these contacts, there had been no other business contacts between Helicol and the State of Texas:

> Helicol never has been authorized to do business in Texas and never has had an agent for the service of process within the State. It never has performed helicopter operations in Texas or sold any product that reached Texas, never solicited business in Texas, never signed any contract in Texas, never had any employee based there, and never recruited an employee in Texas. In addition, Helicol never has owned real or personal property in Texas and never has maintained an office or establishment there. Helicol has maintained no records in Texas and has no shareholders in that State.

*Id.* at 411, 104 S.Ct. 1868.

Considering all the evidence of International's and Associates's contacts under the analysis in *Perkins* and *Helicopteros Nacionales de Colombia, S.A.,* neither the telephone records nor the "other Funds" documents show that International or Associates established continuous and systematic general business contacts. At most, the evidence considered above shows "remote communications" reporting to Texas clients on business conducted outside Texas. *See Credit Commercial de France, S.A.,* 195 S.W.3d at 223.

Moreover, the record shows that the Agency and Administration Agreement between International and the Funds provided that International would not engage in any activity or provide any services within the United States and that the agreement

would be construed and interpreted in accordance with the laws of the British Virgin Islands. Associates did not sign an agreement with the Funds; instead it acted at the direction of International pursuant to the International/BSHI Assistance Agreement, and any activity under that agreement on behalf of International occurred entirely in New York. Thus, International and Associates structured their business contacts to avoid purposeful availment of the benefits and protections of Texas laws. *See Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 375–75 (5th Cir.1987) (goods sold in Texas through a subsidiary were "F.O.B. Wichita"); *American Type Culture Collection, Inc.*, 83 S.W.3d at 808 (contracts with Texas entity signed and performed in Maryland).

### d. Conclusions as to General Jurisdiction

We have reviewed the evidence in the record with respect to whether International or Associates purposefully established sufficient minimum contacts with Texas such that the trial court could exercise general jurisdiction over them. We conclude the record does not contain evidence of continuous and systematic contacts of either International or Associates that would support the exercise of general jurisdiction over them. *See PHC–Minden, L.P.*, 235 S.W.3d at 171. Accordingly, we conclude the trial court did not err in granting International's special appearance on grounds it lacked general jurisdiction over International, and resolve the Receiver's issue and arguments as to general jurisdiction over International against

the Receiver. We further conclude the trial court erred in denying Associates's special appearance on grounds it could exercise general jurisdiction over Associates, and resolve Associates's issue and arguments as to general jurisdiction in its favor.[8]

## V. CONCLUSION

Because of our disposition of Associates's and the Receiver's issues and arguments, we: (1) reverse the trial court's amended order overruling Associates's special appearance and dismiss Associates from this cause for lack of jurisdiction, and (2) affirm the trial court's amended order sustaining International's special appearance and dismissing International from this cause.

---

**8.** Because we have addressed the merits of Associates's argument as to the purposeful availment analysis, we need not address its first issue that the trial court erred in overruling its special appearance because the Receiver failed to meet his threshold burden of pleading sufficient jurisdictional facts as to Associates. *See* TEX.R.APP. P. 47.1. Further,

because we have concluded that neither Associates nor International had the required minimum contacts with Texas, we need not consider issues raised by both the Receiver and Associates as to whether the assertion of jurisdiction over those entities would be consistent with traditional notions of fair play and substantial justice. *See id.*