**REVERSE and RENDER; and Opinion Filed June 30, 2015.**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-14-01349-CV

**TROY BROWN, Appellant**
**V.**
**CURTIS PENNINGTON, Appellee**

**On Appeal from the 162nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-13-12400**

## MEMORANDUM OPINION

Before Justices Fillmore, Stoddart, and Whitehill
Opinion by Justice Fillmore

John Fields, Kyle Phillips, and Advantage Marking and Labeling, Inc. (Advantage) sued Curtis Pennington, seeking declaratory relief from the trial court. Pennington, individually and derivatively on behalf of Advantage, filed counterclaims against Fields and Phillips and third-party claims against Troy Brown, Michael Collins, and the Collins Law Group. Brown filed a special appearance asserting the trial court did not have personal jurisdiction over him. The trial court denied the special appearance.

Brown brought this interlocutory appeal, challenging the sufficiency of the evidence to support certain of the trial court's findings of fact and arguing the trial court erred by denying the special appearance. We reverse the trial court's order denying the special appearance and render judgment dismissing Pennington's claim against Brown for want of personal jurisdiction.

## Background[1]

Fields, Phillips, and Pennington are equal shareholders of Advantage, a corporation with business operations in Texas. Each of them served on Advantage's board of directors, and Pennington was the company president. According to Pennington, Fields and Phillips, "after banding together and deciding to oust Pennington from his position as a salaried Advantage officer, employee, and shareholder," signed a representation agreement with Collins and his law firm on May 4, 2012, "for the purpose of planning the method and manner by which they would squeeze [Pennington] out of the company." On June 27, 2012, Fields and Phillips called a special meeting of the board of directors and voted to remove Pennington as Advantage's president. "Shortly after" June 27, 2012, Collins sent Pennington an email stating Fields and Philips wanted to cause Pennington's "separation" from Advantage by buying his stock.

Pennington subsequently sued Fields, Phillips, and Advantage.[2] Advantage asserted counterclaims in that litigation. At some point, Pennington non-suited his claims. Advantage's counterclaims were tried to the bench, and the trial court rendered a final judgment disposing of those claims.

Advantage had a banking relationship with Bank of America (BOA) and Banc of America, Leasing & Capital (BOALC), and Pennington had personally guaranteed Advantage's obligations to BOA and BOALC. At some point after June 27, 2012, Advantage's debt was moved into the "special asset group" at BOA, and Fields began negotiating with BOA and BOALC about terms under which Advantage's banking relationship with BOA and BOALC could be "stabilized." In late summer 2012, Fields requested that Brown, who is Fields's brother-in-law, replace Pennington as a guarantor of Advantage's obligations to BOA and

---

[1] The facts are taken from the parties' pleadings and evidence relating to the special appearance.

[2] The appellate record does not indicate when this litigation commenced, but reflects it was ongoing during the late summer and fall of 2012.

BOALC. Brown, who is a resident of North Carolina, agreed to do so. The BOA and BOALC representatives involved in the negotiations were located in Missouri and Rhode Island.

Fields also explored an alternative financial arrangement for Advantage with Southwest Bank, which is located in Texas. Brown sent personal financial statements to Southwest Bank during Fields's discussions with the bank. Advantage did not enter into an agreement with Southwest Bank.

Brown signed a Guaranty dated October 19, 2012, in North Carolina. The parties to the Guaranty are Brown, BOA, and BOALC. The address stated on the agreement for BOA is in Georgia. Brown was instructed to return the signed Guaranty to the BOA and BOALC representative in Rhode Island, and the Guaranty states it is governed by the laws of Rhode Island.

Brown also signed a Consent and Release Agreement (the Agreement) in North Carolina. The Agreement states it is "by and among" BOA, BOALC, Advantage, Pennington, and Brown. However, Advantage was not a signatory to the Agreement, and Pennington never signed the Agreement. The Agreement noted in its "Whereas" preamble clauses that:

> Pennington had guaranteed Advantage's obligations to BOA and BOALC;
>
> Pennington was no longer involved in the management of Advantage in any way and drew no salary from Advantage, and his ability to receive any distribution as a shareholder was limited by a corporate resolution that limited such distributions unless there was a cash reserve equal to two month's fixed expenses and salaries, plus the amount of current maturities of Advantage's debt;[3]
>
> Phillips and Fields now control the management of Advantage;
>
> Advantage and Pennington sought BOA's and BOALC's consent to the change of control and Pennington requested to be released from his obligations under his guarantees; and

---

[3] As noted, the Guaranty is dated October 19, 2012. The Agreement states it was "made" on October 19, 2012. Although the record reflects Pennington was not actively involved in the management of Advantage on October 19, 2012, the resolution impacting his salary and shareholder distributions apparently was not passed until December 5, 2012. The facsimile transmission lines on both the Guaranty and the Agreement are dated February 13, 2013.

> BOA and BOALC were willing to consent to the change of control and to release Pennington from his obligations provided that Brown unconditionally guaranteed Advantage's obligations to BOA and BOALC and Advantage consented to amend the terms of a lease with BOALC.

Fields and Phillips, although not listed as parties to the Agreement, signed it as guarantors of Advantage's obligations to BOA and BOALC, acknowledging and consenting to the terms of the Agreement and ratifying and affirming their continuing guaranties of Advantage's obligations to BOA and BOALC.

On October 14, 2013, Fields, Phillips, and Advantage filed this litigation alleging that, only days after non-suiting his claims in the previous litigation, Pennington sent a "Statutory Notice" to Advantage demanding that it take action against Fields, Phillips, Collins, and the Collins Law Firm and threatening that, if Advantage did not take the requested action, Pennington would do so. Fields, Phillips, and Advantage requested declaratory relief from the trial court.[4] Pennington answered and, individually and derivatively on behalf of Advantage, filed counterclaims against Fields and Phillips and third-party claims against Brown, Collins, and the Collins Law Firm. As relevant to this appeal, Pennington alleged Brown "conspired with and/or aided and abetted and/or assisted and encouraged Fields and Phillips in committing" shareholder oppression. Brown filed a special appearance supported by his affidavit in which he negated contacts with the state of Texas.

Pennington responded to the special appearance and, relying on Brown's deposition testimony and exhibits to Brown's deposition, asserted the trial court had specific jurisdiction

---

[4] Fields, Phillips, and Advantage requested declarations that: (1) Fields and Phillips's decision to remove Pennington from the office of president of Advantage did not violate any express agreement or understanding between the shareholders; (2) Pennington is barred by the doctrine of *res judicata* from raising any claims related to the decision to remove him from office; (3) in deciding to remove Pennington from the office of president, Fields and Phillips acted in good faith and reasonably believed they were acting in Advantage's best interest; (4) when Field and Phillips removed Pennington from the office of president, Advantage suffered no damages as a result of the alleged decision by BOA to place Advantage in "special asset service"; (5) Advantage's indemnification of Fields and Phillips for the claims brought by Pennington was authorized and appropriate under Advantage's bylaws and applicable law; and (6) Advantage's refusal to bring a claim against Collins and his law firm was a proper and appropriate exercise of business judgment.

–4–

over Brown.  Pennington also amended his third-party claim against Brown and alleged, as jurisdictional facts,[5] that:

- Prior to 2012, Brown visited Advantage and expressed to Fields, at least, an interest in investing in the company "if it got to another level," and delivered that information to Fields in Texas;

- Fields reached out to Brown sometime in the spring of 2012 and sought Brown's assistance in causing Pennington's removal from all aspects of Advantage, including an ownership interest;

- Brown informed Fields that he was ready, willing, and able to assist Fields and, by extension Advantage and Phillips, in ensuring Advantage was restructured in a manner that eliminated Pennington and that involved Brown substituting for Pennington in connection with the ownership or operation of Advantage and "in particular, with regard to restructuring and replacing [Advantage's] bank debt, in the place and stead of Pennington, but only if [Pennington] had been removed from the ownership and/or management, and was no longer receiving any financial benefit or compensation";

- Brown knew of the disagreements between Pennington, on the one hand, and Fields and Phillips, on the other hand;

- Starting in August 2012, if not earlier, Brown engaged in a series of communications and transactions with Fields, Phillips, Advantage, and two lending institutions, including one, Southwest Bank, that is located in Texas and with whom he dealt, directly, in Texas;

- "At all times relevant," Brown knew that Fields needed him to assist Fields and Phillips in securing funding for a buyout of Pennington's stock and he routinely sent communications to Fields and others in Texas to facilitate such a transaction;

- Brown directed a request to Fields to send him financial information about Advantage so that he could deliver the information to a "money guy" and Fields delivered the information to Brown;

- Brown communicated to Southwest Bank in connection with his effort to assist Fields in restructuring Advantage and its bank debt in a manner that involved ousting Pennington;

---

[5] Pennington alleged other jurisdictional facts that do not relate to his claims against Brown, such as the fact Brown was born in Texas.  We recite only the alleged jurisdictional facts that could support specific jurisdiction over Brown.

–5–

- Pennington's complete separation from Advantage was part of the inducement for Brown's agreement to guaranty the debt of a corporation he had no ownership in and "on information and belief," Fields and Phillips promised some or all of Pennington's Advantage stock as consideration or partial consideration for the guaranty "and/or various services or benefits Brown secretly has rendered or provided to Advantage and/or Fields and Phillips, and/or that he is to provide in the future";

- "On information and belief," Brown communicated to Fields that his agreement to become a guarantor of the Advantage bank debt was conditioned on Pennington having no role in Advantage's management and no ability to receive salary or shareholder distributions; and

- Brown signed a Consent and Release Agreement and a Guaranty to assist in the restructuring of Advantage's ownership and bank debt on a basis where Pennington was removed from all rights to participate in Advantage's management or ability to receive a salary or shareholder distributions and Brown was not only aware of this, but "conditioned his willingness to sign the aforementioned instrument."

Brown filed a second affidavit, as well as an affidavit from Fields. Through Brown's two affidavits and Fields's affidavit, Brown denied all the alleged jurisdictional facts that are relevant in this case. Following a special appearance hearing with no live testimony, the trial court denied Brown's special appearance and entered findings of fact and conclusions of law. The trial court concluded it had jurisdiction over Brown because (1) he contracted with Texas residents for a specific purpose, (2) the contracts he signed were performable, in whole or in part, in Texas, and (3) the torts he is accused of committing or participating in all occurred in Texas, via his conduct directed toward Texas.

**Analysis**

In one issue, Brown challenges the legal and factual sufficiency of the evidence to support a number of the trial court's findings of fact and contends the trial court erred by denying the special appearance.

*Standard of Review*

The trial court's determination it has personal jurisdiction over a nonresident defendant is a question of law that we review under a de novo standard. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). When resolving this question of law, the trial court must frequently resolve questions of fact. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). If the trial court issues findings of fact, those findings are binding upon the appellate court, unless challenged on appeal. *Lombardo v. Bhattacharyya*, 437 S.W.3d 658, 668 (Tex. App.—Dallas 2014, pet. denied). The appellant may challenge the fact findings on legal and factual sufficiency grounds. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). A legal sufficiency challenge to a finding fails if there is more than a scintilla of evidence to support the finding. *Id.* at 795. In conducting a factual sufficiency review, we may set aside the trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Lombardo*, 437 S.W.3d at 668.

In a challenge to personal jurisdiction, a plaintiff and defendant bear shifting burdens of proof. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff has the initial burden to plead sufficient allegations to invoke jurisdiction under the Texas long-arm statute. *Id.* Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant bears the burden of negating all alleged bases of jurisdiction alleged by the plaintiff. *Id.* "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.* The defendant can negate jurisdiction on either a factual or a legal basis. *Id.* at 659.

> Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the

defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.*

### *Findings of Fact*

In his brief, Brown challenges ten of the trial court's findings of fact. Pennington responds that Brown is essentially arguing the trial court was required to accept his version of the evidence. We address each of Brown's challenges separately.

### Finding of Fact No. 5

Brown first challenges the trial court's fifth finding of fact:

On August 14, 2012, Brown sent an email to Fields in Texas asking Fields how his discussions had gone with [BOA]. Brown already had come to learn of a disagreement between Fields and Phillips, on the one hand, and Pennington, on the other hand, in the summer of 2012, when Fields told him that he had a financial issue involving Advantage's loans at [BOA], and requested a co-signature from Brown to stabilize its loans, which required stabilization because of the disputes between Pennington, Fields and Phillips.

Brown contends the evidence established (1) he learned of Fields and Phillips's issues with Pennington in August 2012, not earlier in the summer of 2012; (2) Fields told him that Fields had a financial issue at BOA and needed him to be a guarantor on a loan; (3) at the time of Fields's request, he was not told about, nor agreed to take any action because of, the disputes between Pennington, Fields, and Phillips; and (4) he knew Advantage had been moved into the special asset group by BOA and needed a guaranty to stabilize its banking relationship. Brown asserts there is no evidence that Fields told him that stabilization was necessary because of disputes between Fields and Phillips, on the one hand, and Pennington, on the other hand.

In his affidavits, Brown stated Fields contacted him in late summer or early fall of 2012 and requested that he sign a guaranty to assist Fields in keeping his business solvent. He agreed to assist "solely out of concern for and to assist my sister and her family." Fields stated in his

–8–

affidavit that he contacted Brown in the late summer or early fall of 2012 and asked Brown to sign a guaranty to assist him in keeping his business solvent. We agree with Brown that, to the extent the trial court's finding of fact number five implies Brown learned of Advantage's financial problems earlier than "late summer" of 2012, there is no evidence to support that finding.

In his deposition, Brown testified Fields said he had a problem with the bank and "needed help with giving stability to his loans until he could get it resolved." Brown testified Fields told him that Fields needed a co-signer because Advantage had been moved into the special asset group by BOA. Brown testified he learned about a disagreement between Pennington, on the one hand, and Fields and Phillips, on the other hand, when Fields asked him to co-sign a note,[6] but he did not know very much about the dispute. We conclude there is sufficient evidence to support the trial court's finding that Brown was aware of the dispute between the shareholders in late summer of 2012 when Fields asked him to guaranty the note. Further, there is evidence the instability in Advantage's banking relationship with BOA was due to the dispute. However, to the extent the trial court's finding implies that Brown knew the instability was due to the dispute, there is no evidence to support that finding.

Finding of Fact No. 10

In its tenth finding, the trial court found:

> In mid-September of 2012, Brown engaged in email exchanges with Fields and others, which set forth [BOA's] proposed terms for renewing an Advantage line of credit. Those emails proposed, in part, that Brown would replace Pennington as a guarantor, money owed to Pennington would be subordinate to [BOA] and [BOA's] approval of an agreement to purchase Pennington's ownership in the business would be required.

---

[6] Brown and Fields used the term "co-sign" as well as the term "guaranty." However, the record reflects only an intention that Brown sign a guaranty of Advantage's obligations.

Brown contends the evidence showed only that he was copied on the emails and there is no evidence he "engaged in" the email exchange. Relying on the common meaning of the term, Pennington responds that "engaged in" can include "to do or take part in something" and/or "to give attention to something" and, therefore, the evidence supports the trial court's finding.

Exhibit 1 to Brown's deposition is an email exchange beginning on September 12, 2012. In the first email, Fields asked Kenni Hisel, a representative of BOA, whether she had "heard back from management yet." Hiesel responded to Fields later that day, setting out the terms BOA was requesting for the renewal of Advantage's line of credit. Fields responded to Hisel the next day, with a copy to Brown, questioning certain of the terms requested by BOA. Hiesel responded to Fields that she had left a message on his cellphone and was waiting for his call. In the next email, Fields, with a copy to Brown, thanked Hisel and requested a copy of the adjusted terms. Hiesel, with a copy to Brown, sent the adjusted terms to Fields.

The evidence supports a finding that Brown was copied on at least some of the September 2012 emails exchanged between Fields and Hisel. However, there is no evidence that Brown either initiated any of the emails or was actively involved in the negotiation of terms under which BOA would renew Advantage's line of credit. To the extent the trial court's finding implied any such conduct by Brown, there is no evidence to support it.

<u>Finding of Fact No. 13</u>

The trial court found in finding of fact number thirteen that:

On September 25, 2012, Fields sent an email to [BOA] and Brown, informing [BOA's] Kennie Hisel that Curtis Pennington must be taken off of the to-be-modified loan, which Brown was to guarantee, in order to get litigation with Pennington resolved.

Brown complains the email was sent to Hisel, but only copied to Brown.

Exhibit 4 to Brown's deposition begins with an email from Hisel on September 24, 2012, attaching loan documents and a cover letter. The recipients of this email are not identified in the

–10–

exhibit. On September 25, 2012, Fields responded to the email, with a copy to Brown, asking that Hisel call him because it appears Pennington was still listed as a guarantor and, "[i]n order to get this litigation resolved, he must be taken off as guarantor." Hisel responded, without copying Brown, that Fields should read paragraph 4.k of the document. We conclude the evidence supports the trial court's finding that the September 25, 2012 email from Fields to Hisel was sent, albeit as a copy, to Brown.

### Finding of Fact No. 14

In its fourteenth finding of fact, the trial court stated:

> In late 2012, Brown signed a Consent and Release Agreement and a Guaranty Agreement with [BOA], Fields, Phillips and Advantage which was later fully executed in February of 2013.

Brown asserts there is no evidence that Brown signed a guaranty with BOA, Fields, Phillips, and Advantage or that Brown executed either agreement in late 2012.

In the Guaranty, which is signed only by Brown, Brown "unconditionally guarantee[d] the full and prompt payment" of Advantage's obligations to BOA and BOALC. We agree with Brown that there is no evidence that Fields, Phillips, and Advantage were parties to the Guaranty. As to the date of the documents, the Guaranty states it was signed and delivered on October 19, 2012 and the Agreement states is was "made this 19 day of October, 2012." Although there is evidence the documents may not have been fully implemented until February 2013, there is evidence to support the trial court's finding the documents were signed by Brown in late 2012.

### Finding of Fact No. 16

Finding of fact sixteen states:

> Per Fields'[s] request, Brown also delivered his personal financial statements and information to Southwest Bank, in Texas, as part of the assistance he was providing at the request of Fields, with Advantage Label's restructuring, in Texas.

Brown takes issue with this finding, arguing the evidence established only that he sent his personal financial statements to Southwest Bank, and there is no evidence he sent any other information or that Southwest Bank was in Texas.

Brown admitted he sent his personal financial statements to Southwest Bank. Brown also testified during his deposition that he knew one of the bankers at Southwest Bank and that the banker was located in Texas. We conclude there is no evidence Brown sent any information to Southwest Bank other than his personal financial statements. However, there is sufficient evidence to support the trial court's finding Brown sent his personal financial statements to Southwest Bank in Texas.

Finding of Fact No. 18

The trial court found, in finding of fact number eighteen, that:

Brown did sign a Consent and Release Agreement and a Guaranty Agreement. The Consent and Release Agreement signed by [BOA], Brown, Fields, Phillips and Advantage contains the following recitals: (a) Pennington executed guarantees of Advantage's obligations to [BOA]; (b) Pennington is no longer involved in the management of Advantage in any way and draws no salary from Advantage, and his ability to receive any distributions as a shareholder is limited by a corporate resolution; (c) Kyle Phillips and John Fields now control the management of Advantage; and (d) [BOA] waived Advantage's defaults caused by the removal of Pennington from Advantage having received Brown's unconditional guaranty in the place and stead of Pennington's.

Brown argues there is no evidence that Advantage signed the Agreement, Phillips and Fields signed the Agreement as parties, or the Agreement contained the language in section (d) of the finding as a recital.

As to the complained-about parts of the trial court's finding, Phillips and Fields signed the Agreement, although as guarantors acknowledging and consenting to the terms of the agreement and reaffirming their continuing guaranties, not as parties. However, although the Agreement lists Advantage as the "Obligor," there is no evidence Advantage signed the Agreement. Further, although BOA agreed in the Agreement to waive any defaults caused by

–12–

Phillips and Fields assuming control of Advantage, there is no evidence that language was contained in a recital.

Finding of Fact No. 20

Brown next objects to finding of fact number twenty in which the trial court stated, "Brown knew that what he was being asked to execute was in connection with benefitting Fields, Phillips and Advantage, in Texas." Brown argues the evidence established only that he executed the Agreement and Guaranty to assist Fields with a banking issue.

Brown testified Fields told him that Fields had a banking issue and needed him to sign a guaranty to help keep Fields's business solvent. Brown signed the Guaranty to assist his sister and Fields, but admitted his actions may have also benefitted Advantage and Phillips. We conclude there is sufficient evidence to support the trial court's finding.

Finding of Fact No. 27

Finding of fact number twenty-seven states, "Brown knew that Advantage had the unstable banking relationship with [BOA] in Texas." Brown asserts there is no evidence that BOA was in Texas. We agree with Brown that the evidence established the BOA and BOALC representatives involved in the negotiations with were not located in Texas. However, Advantage was located in Texas and had an unstable banking relationship with BOA. We conclude there is sufficient evidence to support the trial court's finding.

Finding of Fact No. 29

In finding of fact number twenty-nine, the trial court found that "Brown knew Advantage needed a stable banking relationship in order to continue to successfully run its operations in Texas." Brown objects to the finding on the ground there is no evidence he "did" anything in Texas. We read the "in Texas" part of the trial court's finding to relate to Advantage's

–13–

operations, not to Brown's conduct. We conclude there is sufficient evidence to support the trial court's finding.

<u>Finding of Fact No. 30</u>

Brown finally objects to finding of fact number thirty:

> Throughout the time period that Brown was directing communications into Texas for the purpose of assisting in the restructuring of Advantage and its bank debt, Brown transacted business with Texas residents. Brown purposefully availed himself of the benefits and privileges of doing and transacting business with a Texas corporation and a Texas resident, and he intended, purposefully, to direct his contacts to Texas for the purposes stated in his communications to Texas residents, and in instruments he executed to assist Advantage, a Texas corporation, and Texas resident Fields.

Brown argues there is no evidence to support the trial court's findings that (1) he was directing communications into Texas for the purpose of assisting in the restructuring of Advantage and its bank debt, (2) he transacted business with Texas residents, and (3) he "purposefully availed himself of the benefits and privileges of doing and transacting business with a Texas corporation and a Texas resident, and he intended, purposefully, to direct his contacts to Texas for the purposes stated in his communications to Texas residents, and in instruments he executed to assist Advantage, a Texas corporation, and Texas resident Fields." As set out in more detail below, we conclude there is no evidence to support these findings by the trial court.

*Personal Jurisdiction*

A Texas court may exercise personal jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction is consistent with federal and state due process guarantees. *Moki Mac*, 221 S.W.3d at 574. As relevant to Pennington's allegations against Brown, the long-arm statute allows the exercise of personal jurisdiction over a nonresident defendant who (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in Texas, or (2) commits a tort in whole or in part in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West

–14–

2015); *see also Moki Mac*, 221 S.W.3d at 574. The long-arm statute extends personal jurisdiction "as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)). Under the constitutional due process analysis, personal jurisdiction over a nonresident defendant is proper "when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

A nonresident defendant's contacts with a forum can give rise to either specific or general jurisdiction. *BMC Software*, 83 S.W.3d at 795. Pennington's asserted basis is specific jurisdiction. Specific jurisdiction exists when the cause of action arises from or is related to purposeful activities in the state. *Moncreif Oil Intern., Inc. v. OAG Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). Because specific jurisdiction is dispute-specific, we focus on the relationship among the defendant, the forum, and the litigation. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d. at 585.

Purposeful availment is the touchstone of the jurisdictional due process analysis. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *see also Michiana*, 168 S.W.3d at 784. There are three parts to a "purposeful availment" inquiry. *Moki Mac*, 221 S.W.3d at 575. First, only the defendant's contacts with the forum are relevant, not the

unilateral activity of another party or a third person. *Id.* Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. *Id.* And finally, the "defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction." *Id.* (quoting *Michiana*, 168 S.W.3d at 785).

The purpose of the minimum contacts analysis is to protect a nonresident defendant from being haled into court when its relationship with the forum state is too attenuated to support jurisdiction. *Coleman*, 83 S.W.3d at 806. "Significant contacts suggest that the defendant has taken advantage of forum-related benefits, while minor ones imply that the forum itself was beside the point." *Spir Star AG v Kimich*, 310 S.W.3d 868, 872 (Tex. 2010). What is important is the quality and nature of the defendant's contacts with the forum state rather than their number. *Retamco*, 278 S.W.3d at 339.

Pennington alleged that Brown conspired with and/or aided and abetted, and/or assisted and encouraged Fields and Phillips in committing shareholder oppression. The alleged operative facts of Pennington's claim are that Brown, wanting to invest in Advantage, assisted Fields and Phillips in removing Pennington as president and director of Advantage, preventing him from receiving a salary from Advantage, and restricting his right to receive shareholder distributions. Pennington, by asserting Brown committed a tort in Texas, met his initial burden of alleging jurisdiction under the Texas long-arm statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *Moki Mac*, 221 S.W.3d at 574. A state has an interest in exercising judicial jurisdiction over persons who commit torts within its territory. *Moncrief*, 414 S.W.3d at 152. However, Texas's interest in protecting its citizens against torts is insufficient to automatically exercise personal jurisdiction based on an allegation that a nonresident directed a tort from outside the forum against a resident. *Id.* (citing *Michiana*, 168 S.W.3d at 790–91). Rather, the nonresident defendant's contacts must satisfy the purposeful availment inquiry. *Id.*

We turn, therefore, to whether Brown successfully negated each of Pennington's pleaded jurisdictional facts. To the extent possible, we have grouped the pleaded jurisdictional facts into categories.

Pre-June 27, 2012 Acts

Pennington first pleaded Brown visited Advantage's office, expressed to Fields an interest in investing in Advantage if it "got to another level," and delivered this information to Fields in Texas. Brown stated in his affidavit that he visited Advantage's office one time, "several years ago" for social reasons. He testified during his deposition that Advantage had a new facility, Fields was proud of the facility, and he went to see it. Both Brown and Fields confirmed in their affidavits that Brown made the comment about investing in Advantage if it got to another level. According to Brown, both men were in North Carolina when the statement was made. According to Fields, the men never discussed the issue again.

The trial court noted in its findings of fact that Brown admitted (1) he visited Advantage's office one time for social reasons, and (2) made a "passing comment" to Fields that he might be interested in investing in Advantage if it got to another level. However, there is no finding by the trial court, and no evidence in the record, that either Brown's visit to the Advantage facility or a comment made "several years ago" in North Carolina was connected to the operative facts of Pennington's claim against Brown. Therefore, neither of these acts by Brown support the exercise of specific jurisdiction by the trial court. *See Moki Mac*, 221 S.W.3d at 576 (Specific jurisdiction exists "if the defendant's alleged liability 'aris[es] out of or [is] related to' an activity conducted within the forum." (quoting *Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 n.8 (1984)); *Capital Tech. Info. Servs., Inc. v. Arias & Arias Consultores*, 270 S.W.3d 741, 749 (Tex. App.—Dallas 2008, pet. denied) (en banc).

Pennington also alleged that:

> Fields reached out to Brown sometime in the spring of 2012 and sought Brown's assistance in causing the termination of [sic] Curtis Pennington's permanent removal from all aspects of Advantage, including his ownership interest. Brown informed Fields, in Texas, that he was ready, willing and able to assist Fields, and by extension Advantage and Phillips, in ensuring that the Company was restructured in a manner that eliminated Pennington, and that involved Brown substituting for Pennington in connection with the ownership or operation of the Company, and in particular, with regard to restructuring and replacing the Company's bank debt, in the place and stead of Pennington, but only if he had been removed from the ownership and/or management, and was no longer receiving any financial benefit or compensation.

In his affidavit, Brown specifically denied these allegations. The trial court made no finding of fact that (1) Fields communicated with Brown in the spring of 2012 about removing Pennington from his role at Advantage, (2) Brown communicated to Fields his willingness to be involved in removing Pennington from his role at Advantage, or (3) Brown communicated to Fields that he would be involved in replacing Pennington on Advantage's bank debt only if Pennington had been removed from ownership and/or management and was no longer receiving any financial benefit or compensation. Further, there is no evidence of such communications in the record. We conclude Brown successfully negated these alleged jurisdictional facts.

Communications Relating to Advantage's Debt

Pennington next alleged that Brown's conduct during the negotiations with BOA, BOALC, and Southwest Bank over Advantage's debt supports the trial court's exercise of specific jurisdiction over Brown. Pennington specifically alleged that Brown knew of the disagreements between Pennington, on the one hand, and Fields and Phillips, on the other hand; starting in August 2012, if not earlier, Brown engaged in a series of communications and transactions with Fields, Phillips, Advantage, and two lending institutions, including one, Southwest Bank, that is located in Texas and with whom he dealt, directly, in Texas; "at all times relevant," Brown knew Fields needed him to assist Fields and Phillips in securing funding for a

–18–

buyout of Pennington's stock and he routinely sent communications to Fields and others in Texas to facilitate such a transaction; Brown directed a request to Fields to send him financial information about Advantage so that he could deliver the information to a "money guy" and Fields delivered the information to Brown; and Brown communicated to Southwest Bank in connection with his effort to assist Fields in restructuring Advantage and its bank debt in a manner that involved ousting Pennington.

We turn first to Pennington's allegation that Brown knew of the disagreements between Pennington, on the one hand, and Fields and Phillips, on the other hand. In our discussion of the trial court's finding of fact number five, we concluded the evidence supports a finding that Brown was aware of the dispute between the shareholders in the late summer when Fields asked him to co-sign the note with BOA and BOALC. Brown, however, learned of the dispute from Fields. A communication from a Texas resident to a nonresident defendant is insufficient to support jurisdiction over the nonresident defendant. *Moncreif*, 414 S.W.3d at 152 ("[T]he unilateral activity of another person cannot create jurisdiction."); *Michiana*, 168 S.W.3d at 786–87 (telephone call from Texas resident to nonresident defendant that led to sale of product insufficient to constitute purposeful availment by nonresident defendant).

We next turn to Pennington's allegation that Brown engaged in a series of communications and transactions with Fields, Phillips, Advantage, BOA, BOALC and Southwest Bank. In the summer and fall of 2012, there were a number of emails pertaining to Fields's attempts to stabilize Advantage's banking relationship. We first disregard any emails sent or copied to Brown because these communications will not support jurisdiction over Brown in Texas. *See Moncrief*, 414 S.W.3d at 152; *Michiana*, 168 S.W.3d at 786–87. As to communications initiated by Brown, on August 14, 2012, Brown sent Fields an email asking about the status of the negotiations with BOA. At some point, Brown sent his personal financial

statements to Southwest Bank. On August 31, 2012, Brown sent an email to Fields, in response to an email from Fields titled "Buyout" that included financial information relating to Advantage, asking if he could forward the information to a "money guy."[7] On September 4, 2012, Fields asked if Brown had forwarded the information, and Brown responded that he had done so. Brown did not direct any emails to BOA or BOALC in Texas.

Brown did not physically enter Texas in August and September of 2012. Further, he did not communicate with either BOA or BOALC in Texas. Rather, his communications were through emails with Fields regarding the status of negotiations relating to Advantage's financial issues. These communications do not constitute a contact demonstrating purposeful availment. *See Olympia Capital Assocs., L.P. v. Jackson*, 247 S.W.3d 399, 416–17 (Tex. App.—Dallas 2008, no pet.) (communications through telephone and email regrading negotiation and performance of contract between Texas plaintiffs and nonresident defendant were not contacts of nonresident defendant with Texas); *KC Smash 01, LLC v Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 393 (Tex. App.—Dallas 2012, no pet.) (rejecting telephone calls and emails as evidence of purposeful availment). To the extent Brown's communications with Fields by email relate to the operative facts of Pennington's claim, they are insufficient to support the trial court's exercise of jurisdiction over Brown.

<u>Guaranty and Consent and Release Agreement</u>

Pennington's remaining jurisdictional allegations are based on Brown's signing the Guaranty and the Agreement, and his reasons for signing the documents. Pennington specifically alleged that (1) Pennington's complete separation from Advantage was part of the inducement for Brown's agreement to guaranty the debt of a corporation in which he had no

---

[7] Pennington alleged that Brown directed Advantage's financial information be sent to him. Brown denied this allegation and there is no evidence in the record that Brown requested the information from Fields or Advantage.

ownership; (2) "on information and belief," Fields and Phillips promised Brown some or all of Pennington's stock as consideration for the Guaranty or other services Brown had, or would, provide to Advantage; (3) "on information and belief," Brown communicated to Fields that his agreement to become a guarantor of the Advantage bank debt was conditioned on Pennington having no role in Advantage's management and no ability to receive salary or shareholder distributions; and (4) Brown signed the Agreement and the Guaranty to assist in the restructuring of Advantage's ownership and bank debt on a basis where Pennington was removed from all rights to participate in Advantage's management or ability to receive a salary or shareholder distributions and was not only aware of this, but "conditioned his willingness to sign the aforementioned instrument." Brown denied all these jurisdictional allegations.

As to the second allegation, the trial court found Brown was not promised any or all of Pennington's stock as consideration or partial consideration for signing the Guaranty. The trial court made no findings pertaining to the first, third, and fifth allegations, and there is no evidence in the record that Pennington's complete separation from Advantage was part of the inducement for Brown to guaranty the debt or that Brown communicated to Fields that (1) his agreement to become a guarantor of Advantage's bank debt was conditioned on Pennington having no role in Advantage's management and no ability to receive a salary or shareholder distributions, or (2) he conditioned his willingness to sign the Guaranty and the Agreement on Pennington having no role in Advantage's management and no ability to receive a salary or shareholder distributions. Rather, the evidence established that Fields asked Brown to be a guarantor of Advantage's bank debt, and Brown agreed to do without any conditions.

We finally turn to Pennington's fourth allegation that Brown executed the Guaranty and the Agreement to aid in the restructuring of Advantage's ownership and bank debt on a basis where Pennington was removed from all right to participate in Advantage's management or

–21–

ability to receive a salary or shareholder distributions. The evidence established that, in late summer 2012, Fields contacted Brown, told him Advantage had been moved into the special asset group by BOA, and requested he guaranty a note to stabilize Advantage's banking relationship. Brown agreed to do so to help his sister and his brother-in-law and ultimately signed both the Guaranty and the Agreement. In a "whereas" preamble clause, the Agreement acknowledged Pennington was no longer in control of Advantage and that a corporate resolution prevented Pennington from receiving a salary from Advantage and restricted his right to receive shareholder distributions from Advantage.

No Texas resident was a party to the Guaranty. Rather, Brown, a resident of North Carolina, BOA, with an address in Georgia and a representative in Rhode Island, and BOALC, with an address and a representative in Rhode Island, were parties to the agreement. The Guaranty is governed by the laws of Rhode Island, and Brown signed the Guaranty in North Carolina. The Agreement states it was made "by and among" BOA, BOALC, Advantage, Pennington, and Brown. However, Advantage was not a signatory on the Agreement, and Pennington did not sign the Agreement. Although Phillips and Fields signed the Agreement, they did so only as guarantors of Advantage's obligations to BOA and BOALC and to confirm they acknowledged and consented to the terms of the Agreement and to ratify and affirm their continuing guaranty of Advantage's obligations to BOA and BOALC. Neither the Guaranty nor the Agreement was a contract between Brown and any Texas resident.[8]

The trial court made no findings, and there is no evidence, that Brown was involved in negotiating the terms under which BOA and BOALC would continue to extend credit to Advantage, was involved in the drafting of the Guaranty or the Agreement, or was involved in

_____

[8] The fact the Agreement discussed Pennington's removal from the management and payroll of Advantage does not impact our analysis. The Agreement did not cause Pennington's removal and merely acknowledged that a "Change in Control Event" had occurred at Advantage.

–22–

the decisions by the Advantage board of directors to remove Pennington as an officer and director and to pass the resolution that prevented Pennington from receiving a salary from Advantage and restricted his right to receive shareholder distributions from Advantage. Further, the trial court made no findings, and there is no evidence, that Brown benefitted by BOA and BOALC continuing to loan money to Advantage or by the Advantage board of directors removing Pennington as an officer and director or passing the resolution. *See Michiana*, 168 S.W.3d at 785; *KC Smash*, 384 S.W.3d at 394 (noting there was no evidence nonresident defendant sought benefit, advantage, or profit by "availing" itself of the forum). We cannot conclude that Brown's signing of the Guaranty and the Agreement was a sufficient contact directed toward Texas to subject him to the jurisdiction of the Texas court.

## *Conclusion*

Pennington framed his jurisdictional allegations against Brown in terms of the "totality of the circumstances" relating to issues occurring in Texas between Advantage's shareholders and the need for Advantage to establish a new lending relationship. "However, if the acts themselves fail to establish minimum contacts and purposeful availment, the defendant's knowledge of the relationship to Texas will not make the defendant amenable to the jurisdiction." *KC Smash*, 384 S.W.3d at 394. We conclude Brown lacked sufficient minimum contacts to support the trial court's exercise of specific jurisdiction over him as to Pennington's claim.[9] Therefore, the trial court erred by denying Brown's special appearance.

---

[9] Because Brown lacks minimum contacts with Texas to support personal jurisdiction, we need not consider the second prong of the constitutional due process analysis—whether maintenance of the action offends traditional notions of fair play and substantial justice. *Foley v. Trinity Indus. Leasing Co.*, 314 S.W.3d 593, 602 (Tex. App.—Dallas 2010, no pet.).

We resolve Brown's issue in his favor and render judgment dismissing Pennington's claim against Brown for want of jurisdiction.


/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE


141349F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TROY BROWN, Appellant

No. 05-14-01349-CV     V.

CURTIS PENNINGTON, Appellee

On Appeal from the 162nd Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. DC-13-12400.
Opinion delivered by Justice Fillmore,
Justices Stoddart and Whitehill participating.

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's order denying appellant Troy Brown's special appearance and **RENDER** judgment dismissing appellee Curtis Pennington's claims against appellant Troy Brown for want of jurisdiction.

It is **ORDERED** that appellant Troy Brown recover his costs of this appeal from appellee Curtis Pennington.

Judgment entered this 30th day of June, 2015.