**Affirm and Opinion Filed August 18, 2020**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-20-00021-CV

## MICHAEL J. PETER, Appellant
## V.
## JOSHUA STERN, Appellee

### On Appeal from the 160th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-18-18146

## MEMORANDUM OPINION

Before Chief Justice Burns,[1] Justice Pedersen, III, and Justice Evans
Opinion by Justice Pedersen, III

Appellee Joshua Stern filed suit against appellant Michael J. Peter, a Florida resident, for fraud and breach of contract after a failed business venture. Peter filed a special appearance denying general and specific jurisdiction in Texas. Stern argued Peter was subject to Texas jurisdiction because he purposefully availed himself of the privileges of conducting business within the forum and committing fraud within the state. The trial court denied Peter's special appearance.

---

[1] The Honorable David L. Bridges, Justice, participated in the submission of this case; however, he did not participate in the issuance of this opinion due to his death on July 25, 2020. Chief Justice Robert Burns has substituted for Justice Bridges and has reviewed the briefs and the record before the Court.

On appeal, Peter first argues the trial court erred by concluding Texas has jurisdiction over him as a nonresident defendant. In a second issue, he argues his special appearance and first amended special appearance comply with Texas Rule of Civil Procedure 120a. We affirm the trial court's order.

## Background

The underlying pleadings and evidence from the special appearance hearing establish the following facts regarding the business venture and parties involved in the litigation.

In early 2016, Peter and David Sebag collaborated to raise funds to own and operate a club in Panama. Peter and Sebag lived in Florida. They enlisted Edwin Maldonado, an Irving resident, to reach out to potential Texas investors.

Maldonado approached Stern about an investment opportunity and explained the investment was designed to produce income and create an ownership interest for Stern. Stern was unsure exactly what Maldonado did for Peter, but Stern understood Maldonado worked for Peter, and Peter supported Maldonado. Stern thought Maldonado was "[p]ossibly an investor."

Stern knew of Peter because he was well-known in the club management industry. Stern described Peter as "kind of a legend in the industry."

In March 2016, Stern considered buying one of Peter's clubs called Aladdin's Dream Boutique after Maldonado approached him about the deal. Stern ultimately passed on the opportunity.

In May 2016, Stern visited Peter in Florida to discuss another investment opportunity in a Panamanian club. Documents in the record refer to a company or investment called Solid Gold International, SA and 4Play.

During the meeting, Stern met Sebag. Peter told Stern he was in charge of the project and Sebag was assisting him. Peter also told Stern his investment would return at least ten times the original investment in two years and promised him five percent equity in the Panama club.

Stern returned to Florida in June. He met Peter at Solid Gold, one of Peter's clubs. At times, the meeting involved only Stern and Peter. Other times, Maldonado and Sebag were present. Peter told Stern that Sebag and Maldonado worked and operated under his direction. Peter described Sebag as "a trusted member of his inner circle" for over twenty years. Sebag not only worked for Peter but also lived at his home and received financial support from him.

Peter told Stern he was looking for someone younger with operating experience who could occasionally travel to Panama and oversee operations. During the meeting, which lasted about an hour, Peter told Stern he anticipated a doubling of the investment within the first couple years.

Stern did not give any money for the business venture at that time. Instead, Peter said he would send wiring instructions.

In addition to Peter's wiring instructions, Stern also later received a confidentially-marked Private Placement Memorandum (PPM), which described

Solid Gold International, SA terms of the offering, and risks of the investment. The PPM listed Peter as chairman and Sebag as managing partner.

Shortly thereafter, Stern attempted to wire money to Peter; however, because of issues with the bank, he could wire only a portion of the funds. Peter said he would send Sebag to Texas to pick up the remaining money.

Sebag sent Stern an email on July 29, 2016, from his "solidgoldcasino.com" account informing Stern he planned to be in Dallas the following Monday through Wednesday, and he looked forward to getting together because they had a "lot of good things to talk about." During Sebag's Dallas trip, Stern gave Sebag $30,000.

Stern met Peter again in 2018 at a different Florida club. They discussed the Panama investment and lack of any progress over the previous two years. Stern described the investment as "nebulous . . . at this point." Maldonado, Sebag, and another investor named Mitty Jayaseelan also attended the meeting. Towards the end of the meeting, Sebag and Maldonado left. Peter then explained the status of the Panama investment and offered to refund Stern's and Jayaseelan's investments, but with the caveat that if the venture turned around, they could not get back in the deal. Stern expected a refund "within a relatively short time frame" because they were friends. When it did not happen, he was surprised.

When Peter failed to refund the money, Stern filed suit in Texas for breach of contract, fraud, and conspiracy. Stern alleged he relied on Maldonado's and Sebag's representations made on Peter's behalf when he decided to give Sebag the money

and invest in the Panama project. Stern asserted the representations about the project were false and he was harmed.

Peter filed a special appearance challenging jurisdiction in Texas. Stern argued jurisdiction in Texas was proper based on agency. After a hearing, the trial court denied Peter's special appearance without issuing findings of fact or conclusions of law. This appeal followed.

## Special Appearance Standard of Review and Applicable Law

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018); *see also Golden Peanut Co., LLC v. Give & Go Prepared Foods Corp.*, No. 05-18-00626-CV, 2019 WL 2098473, at \*2 (Tex. App.—Dallas May 14, 2019, no pet.) (mem. op.). If, as in this case, the trial court does not issue findings of fact and conclusions of law with its special appearance ruling, we imply all findings of fact necessary to support its ruling that are supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When jurisdictional facts are undisputed, whether those facts establish jurisdiction is a question of law. *Old Republic*, 549 S.W.3d at 558.

Texas courts may exercise personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute permits exercising jurisdiction and (2) asserting jurisdiction satisfies constitutional due process guarantees. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70 (Tex. 2016). The

–5–

Texas long-arm statute reaches "as far as the federal constitutional requirements that due process will allow." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). Personal jurisdiction over a nonresident defendant satisfies constitutional due process guarantees when (1) the nonresident defendant has established minimum contacts with the forum state and (2) exercising jurisdiction comports with traditional notions of fair play and substantial justice. *See M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017) (citing *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

Minimum contacts are established when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking its laws, benefits, and protections. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657–58 (Tex. 2010). The purposeful-availment inquiry includes three parts: (1) only the defendant's contacts are relevant; (2) the contact must be purposeful, not random, fortuitous, or attenuated; and (3) the defendant must seek some advantage, benefit, or profit by availing itself of the forum. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007).

A nonresident defendant's forum-state contacts may give rise to two types of personal jurisdiction. *Id.* Specific jurisdiction, also called case-linked jurisdiction, is established if the defendant's alleged liability arises out of or relates to the defendant's contacts with the forum state. *Id.* at 576. A claim arises from or relates to the forum contacts if there is a "substantial connection between [the] contacts and

the operative facts of the litigation." *Id*. at 585. The specific-jurisdiction analysis focuses on the relationship between the defendant, the forum, and the litigation. *Id*. at 575–76. Specific jurisdiction requires us to analyze jurisdictional contacts on a claim-by-claim basis unless all claims arise from the same forum contacts. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150–51 (Tex. 2013).

A court has general jurisdiction, also called all-purpose jurisdiction, over a nonresident defendant whose "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016); *Golden Peanut*, 2019 WL 2098473, at \*3. The "paradigm" forums in which a corporate defendant is "at home" are the corporation's place of incorporation and its principal place of business. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017). But "[t]he exercise of general jurisdiction is not limited to these forums; in an 'exceptional case,' a corporate defendant's operations in another forum 'may be so substantial and of such a nature as to render the corporation at home in that State.'" *Id*. (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014)). The test for general jurisdiction presents "a more demanding minimum contacts analysis than for specific jurisdiction." *TV Azteca*, 490 S.W.3d at 37. When a court has general jurisdiction over a nonresident, it may exercise jurisdiction even if the cause of action did not arise from activities performed in the forum state. *Golden Peanut*, 2019 WL 2098473, at \*3.

–7–

## Specific Jurisdiction

Broadly stated, specific jurisdiction exists when the plaintiff's claims "arise out of" or "relate to" the defendant's contact with the forum. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016) (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 317 (1945)). The Supreme Court has emphasized that the defendant's relationship, not the plaintiff's relationship, with the forum state is the proper focus of the specific-jurisdiction analysis. *Id.* In short, specific jurisdiction "does not turn on where a plaintiff happens to be, and does not exist where the defendant's contacts with the forum state are not substantially connected to the alleged operative facts of the case." *Id.* at 70. Rather, there are three features of the "purposeful availment" inquiry as applied to specific jurisdiction: (1) the relevant contacts are those of the defendant; (2) the contacts that establish purposeful availment must not be random, fortuitous, isolated, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by "availing" himself of the jurisdiction. *Id.* at 67.

Stern relies on an agency relationship between Sebag, Maldonado, and Peter to establish specific jurisdiction in Texas over Peter. Contacts of an agent or corporate representative may be sufficient to confer jurisdiction on the principal. *See MasterGuard L.P. v. Eco Tech. Int'l, LLC*, 441 S.W.3d 367, 377 (Tex. App.—Dallas 2013, no pet.); *see also Olympia Capital Assocs., L.P. v. Jackson*, 247 S.W.3d 399, 412 (Tex. App.—Dallas 2008, no pet.). An agent is one who consents to the control of another to conduct business or manage some affair for the other, who is the

principal. *Olympia Capital Assocs*., 247 S.W.3d at 413. We do not presume an agency relationship exists, and the burden of proof is on the party asserting the existence of the relationship. *Id*.

An essential element of the principal-agent relationship is the alleged principal's right to control the actions of the alleged agent. *Id*. (citing *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993)). This right includes not only the right to assign tasks but also the right to dictate the means and the process by which an agent will accomplish the task. *Id*. In contrast, when one has the right to control the end sought to be accomplished, but not the means and details of how it should be accomplished, the person employed acts as an independent contractor and not as an agent. *Id*. This distinction is critical because an agent's contacts with the forum are attributable to the principal, but the contacts of an independent contractor are not. *Id*.

By denying Peter's special appearance, the trial court impliedly found facts in support of Stern's agency theory as a basis for attributing Sebag's and Maldonado's Texas contacts to Peter. Peter argues there is no evidence supporting Stern's agency theory.

Stern had the burden of proof regarding whether an agency relationship existed. *Id*. When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827

(Tex. 2005). We will conclude that evidence is legally insufficient to support an implied finding only if (1) there is a complete absence of evidence of a vital fact; (2) we are barred by rules of evidence or law from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id*. at 819.

The record indicates Maldonado, who worked for Peter, approached Stern in early 2016 about a Panamanian investment opportunity designed to produce income and create an ownership interest for Stern. In June, Stern traveled to Florida, where he met Peter and was introduced to Sebag, described as a "trusted member of [Peter's] inner circle" for over twenty years. Stern later learned that Sebag lived in Peter's home and received financial support from him.

Once Stern decided to invest, Peter told him he would send him wiring instructions. The June 15, 2016 confirmation for wiring funds to purchase shares in the 4Play Panama Company was sent on Solid Gold International letterhead. Sebag sent the confirmation to Stern as "President Solid Gold International, SA" with directions to "specify the final beneficiary: Solid Gold International, SA/4PLAY PANAMA." In addition to wiring instructions, Stern also later received a PPM marked confidential for Solid Gold International, SA listing Peter as chairman and

Sebag as managing partner. Peter owned the registered trademark for Solid Gold and had since December 7, 2010.

Stern also received a letter on July 27, 2016, from Sebag, signed in his capacity as "President." Sebag addressed the letter to "all participants" regarding preferential investment terms for those investing in the "4Play project in Panama." The letter further provided that "David S. Sebag and Michael J. Peter" had agreed unanimously to the preferential terms. One such term for participants included "a preferred investment position into the Solid Gold project at the Hard Rock Hotel Panama Megapolis or any other project in Panama."

When Stern was unable to wire all the money for his portion of the investment because of bank issues, Peter said he would send Sebag to Texas to pick up the remaining money. The July 29, 2016 email from Sebag's "solidgoldcasino.com" account confirmed his plans to come to Texas to get the money. During Sebag's Dallas trip, Stern gave him $30,000. Stern believed the money he gave to Sebag, and through the wire transfer, went to Peter.

While the record is unclear concerning the full extent of the investment in Solid Gold International, SA/4Play and Stern testified as much when he testified that "it seemed like a nebulous investment," there is more than a scintilla of evidence for the trial court to have impliedly found an agency relationship existed based on Peter telling Stern both Maldonado and Sebag worked for him, the paper trail of documents referring to Solid Gold, a trademark owned by Peter, and Stern's

–11–

testimony that Peter sent Sebag to Texas to get the remaining money and such exchange occurred. This evidence indicates Peter controlled the actions of Maldonado and Sebag by assigning tasks and dictating how such tasks were accomplished to ultimately convince Stern to invest in Peter's Panama entity. *See Olympia Capital Assocs.*, 247 S.W.3d at 412 (recognizing essential element of agency is principal's right to control actions of agents).

The recruitment of Stern to invest partly took place in Texas and is the basis for his fraud claim. As explained, Maldonado's and Sebag's activities in Texas, on behalf of Peter, were "purposeful rather than random, fortuitous, or attenuated." *See, e.g., Cornerstone Healthcare Grp. Holding, Inc.*, 493 S.W.3d at 73 (concluding contacts in Texas were purposeful because respondent sought both a Texas seller and Texas assets); *see also MasterGuard LP*, 441 S.W.3d at 381 (concluding contacts of agent were purposeful when recruitment of dealers occurred in Texas and provided basis for tortious interference claim) (citing *Moki Mac*, 221 S.W.3d at 575). We acknowledge the PPM states any dispute would be subject to arbitration in Florida and governed by Panamanian law; however, a foreign choice-of-law provision does not prevent Texas courts from exercising personal jurisdiction. *See IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 598 (Tex. 2007) (choice-of-law provision does not prevent Texas courts from exercising jurisdiction but cannot be ignored in considering purposeful availment). Here, unlike the defendant in *Griego*, Peter's agents solicited a Texas resident in Texas for an investment. *Contra id.* (concluding

–12–

nature and quality of contacts were random, isolated, and fortuitous because IRA Resources did not advertise, solicit Griego's investment, or negotiate terms of contract in Texas).

Peter sought a "benefit, advantage or profit by availing [him]self of the jurisdiction" by receiving money from a Texas resident to invest in his Panama entity. *Moki Mac*, 221 S.W.3d at 575; *see also MasterGuard LP*, 441 S.W.3d at 381 (establishing contractual relationship with independent dealers in Texas would result in increased sales and a benefit, advantage, or profit to defendant). Because the facts surrounding the transaction will be the focus of the claims against Peter at trial, the claims arise out of his contacts with Texas.

Considering the evidence in the light most favorable to the judgment and indulging every reasonable inference supporting the trial court's implied findings, we conclude the evidence is legally sufficient to support the trial court's implied finding and conclusion that an agency relationship existed between Peter, Maldonado, and Sebag such that sufficient minimum contacts with Texas exist to subject Peter to the specific, personal jurisdiction of Texas's courts. *See Olympia Capital Assocs.*, 247 S.W.3d at 408 ("A legal sufficiency challenge to a finding of fact fails if there is more than a scintilla of evidence to support the finding.").

The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827. A reviewing court cannot substitute its

–13–

judgment for that of the trier-of-fact so long as the evidence falls within this zone of reasonable disagreement. *Id.* at 822. The evidence here, though not strong, falls within the zone of reasonable disagreement, and therefore, we must uphold the court's implied agency finding supporting minimum contacts.

Although we have concluded minimum contacts exist, we must now consider whether the exercise of personal jurisdiction satisfies the traditional notions of fair play and substantial justice. *Moncrief Oil Int'l Inc.*, 414 S.W.3d at 154. Determining this issue involves consideration of the burden on the nonresident defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of several states in furthering substantive social policies. *Id.* at 155.

When a nonresident has purposefully established minimum contacts with the forum state, it will be only a rare case when the exercise of jurisdiction over that defendant does not comport with traditional notions of fair play and substantial justice. *Id.* at 154. This is not one of the rare cases.

Subjecting Peter to suit in Texas may impose some burden, but the same can be said of all nonresidents. Distance alone cannot ordinarily defeat jurisdiction. *Id.* at 155. Given that Maldonado lives in Texas and Sebag has traveled to Texas in the past, we cannot say the burden of litigating in Texas is so severe as to defeat jurisdiction. Further, this burden is somewhat mitigated by the convenience of Stern,

–14–

a Texas resident, litigating in the forum where he originally met Maldonado, who initiated the investment talks, and where he paid Sebag the remaining $30,000. Moreover, the allegations that Peter committed a tort in Texas against a Texas resident through his agents implicates a serious state interest in adjudicating the dispute. *See id.* Balancing the factors, the burden on Peter of litigating in a foreign jurisdiction is minimal and outweighed by Texas's interests in adjudicating the dispute.

We overrule Peter's specific-jurisdiction challenge. Having overruled this issue, we need not consider general jurisdiction or whether his special appearance and amended special appearance complied with Texas Rule of Civil Procedure 120a. *See* TEX. R. APP. P. 47.1. We likewise need not consider Stern's cross-issue challenging the trial court's refusal to admit Maldonado's deposition testimony at the special appearance hearing. *Id.*

## Conclusion

We conclude the Texas long-arm statute permits the exercise of jurisdiction over Peter and the assertion of jurisdiction is consistent with the traditional notions of fair play and substantial justice. The trial court did not err by denying Peter's special appearance. Accordingly, we affirm the trial court's order.

/Bill Pedersen, III//

BILL PEDERSEN, III
JUSTICE

200021f.p05

Evans, J. dissenting



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MICHAEL J. PETER, Appellant

No. 05-20-00021-CV     V.

JOSHUA STERN, Appellee

On Appeal from the 160th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-18-18146. Opinion delivered by Justice Pedersen, III. Chief Justice Burns and Justice Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee JOSHUA STERN recover his costs of this appeal from appellant MICHAEL J. PETER.

Judgment entered this 18th day of August, 2020.